Exhibit B

Page 1

1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF SAN DIEGO

3                          - - -

4    MABVAX THERAPEUTICS        )

     HOLDINGS, INC.,            )

5                               )

            Plaintiff,          )

6                               ) No. 37-2019-00018398

            vs.                 )     CU-SL-CTL

7                               )

     BARRY HONIG, et al.,       )

8                               )

            Defendants.         )

9                               )

10

11

12

13

14                    DEPOSITION OF

15            JOHN DAVID HANSEN, VOLUME I

16             Monday, January 17, 2022

17

18

19

20

21

22   Reported By:

23   MICHELLE K. BAILEY

     RPR, CSR No. 10713

24   Job No. 5032741

25   Pages 1 - 274

Page 2

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                      COUNTY OF SAN DIEGO
 3                            - - -
 4   MABVAX THERAPEUTICS          )
     HOLDINGS, INC.,              )
 5                                )
             Plaintiff,           )
 6                                ) No. 37-2019-00018398
             vs.                  )      CU-SL-CTL
 7                                )
     BARRY HONIG, et al.,         )
 8                                )
             Defendants.          )
 9                                )
10
11
12
13
14          Deposition of JOHN DAVID HANSEN, VOLUME I,
15   taken on behalf of the Defendants, beginning at 9:07
16   a.m., and ending at 6:05 p.m., on Monday,
17   January 17, 2022, before MICHELLE K. BAILEY, RPR, CSR
18   No. 10713.
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
     For the Plaintiff MabVax Therapeutics Holdings, Inc.:
 3
         BAKER BOTTS
 4       BY:  JONATHAN A. SHAPIRO, ESQ.
              BRIAN C. KERR, ESQ.
 5            JULIE RUBENSTEIN, ESQ.
              BYRON BECKER, ESQ.
 6       101 California Street
         Suite 3600
 7       San Francisco, California  94111
         415.291.6200
 8       jonathan.shapiro@bakerbotts.com
 9
     For Cross-Defendants John David Hansen
10   and Gregory P. Hanson:
11       COOLEY LLP
         BY:  PETER M. ADAMS, ESQ.
12            KOJI F. FUKUMURA, ESQ.
              LINH K. NGUYEN, ESQ.
13            BRIAN M. FRENCH, ESQ.
              ZACHARY WILLIAMS, ESQ.
14       4401 Eastgate Mall
         San Diego, California  92121
15       858.550.6008
         padams@cooley.com
16
17   For the Defendants Robert Prag; The Del Mar Consulting
     Group, Inc.; The Del Mar Consulting Group, Inc.
18   Retirement Plant Trust:
19       KEENEY WAITE & STEVENS
         BY:  BRIAN L. FRARY, ESQ.
20       402 West Broadway
         Suite 1820
21       San Diego, California  92101
         619.238.1661
22       frary@keenlaw.com
23
24
25
```

```
                                                    Page 4
 1    APPEARANCES (continued):
 2
      For the Defendants Barry Honig; GRQ Consultants, Inc.;
 3    GRQ Consultants, Inc. 401K; GRQ Consultants, Inc. ROTH
      401K FBO Barry Honig; GRQ Consultants, Inc. ROTH 401K
 4    FBO Renee Honig; Barry and Renee Honig Charitable
      Foundation, Inc.; Southern Biotech, Inc.; John Stetson;
 5    HS Contrarian Investments LLC:
 6        SHEPPARD MULLIN RICHTER & HAMPTON, LLP
          BY:  ROBERT D. WEBER, ESQ.
 7             KRISTIN HOUSH, ESQ.
          1901 Avenue of the Stars
 8        Suite 1600
          Los Angeles, California  90067
 9        858.720.8900
          rweber@sheppardmullin.com
10
11    For the Defendants OPKO Health, Inc., and Steven Rubin:
12        AKERMAN, LLP
          BY:  SAMANTHA J. KAVANAUGH, ESQ.
13        98 SE 7th Street
          Suite 1100
14        Miami, Florida  33131
          305.982.5643
15        samantha.kavanaugh@akerman.com
16
      For the Defendants Michael Brauser; Grander Holdings,
17    Inc.; Grander Holdings, Inc. 401K:
18        RICHARD AND RICHARD, P.A.
          BY:  MELISSA L. MACKIEWICZ, ESQ.
19        825 Brickell Bay Drive
          Tower III, Suite 1748
20        Miami, Florida  33131
          305.374.6688
21        melissa@richardandrichard.com
22
23
24
25
```

```
                                                    Page 5
 1    APPEARANCES (continued):
 2
      For the Defendants Mark Groussman; Melechdavid, Inc.;
 3    Melechdavid, Inc. Retirement Plan:
 4         BAKER & McKENZIE, LLP
           BY:  EDWARD TOTINO, ESQ.
 5             BENJAMIN W. TURNER, ESQ.
           10250 Constellation Blvd.
 6         Suite 1850
           Los Angeles, California  California
 7         310.201.4728
           edward.totino@bakermckenzie.com
 8
 9    For Defendants Phillip Frost; Frost Gamma Investments
      Trust:
10
           MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, PC
11         BY:  ROBERT J. ANELLO, ESQ.
           565 Fifth Avenue
12         New York, New York  10017
           212.880.9520
13         ranello@maglaw.com
14
      ALSO PRESENT:
15
           Jordan Bruce, videographer
16         Robert Prag
           Barry Honig
17         John Stetson
           Mark Groussman
18         Michael Brauser
19
20
21
22
23
24
25
```

Page 6

```
 1                      I N D E X
 2   WITNESS:  JOHN DAVID HANSEN
                                                    PAGE
 3
     EXAMINATION BY MR. WEBER                         10
 4
 5
 6                    E X H I B I T S
 7   EXHIBIT NO.          DESCRIPTION             PAGE
 8   Exhibit 1      MabVax 2014 Form 10-K           25
 9   Exhibit 2      MabVax 2015 Form 10-K           30
10   Exhibit 3      MabVax 2016 Form 10-K           31
11   Exhibit 4      MabVax 2017 Form 10-K           33
12   Exhibit 5      MabVax 2018 Form 10-Q           34
13   Exhibit 6      Second Amended Complaint        44
14   Exhibit 7      SEC Form 4 for John Hansen,    115
                    dated 4/4/2016
15
     Exhibit 8      E-mail from John David Hansen   134
16                  to Mr. Honig and Mr. Stetson,
                    dated 8/25/2015
17
     Exhibit 9      Letter from MabVax to          149
18                  Stockholders, dated 9/2/2016,
                    signed by John David Hansen
19
     Exhibit 10     E-mail exchange between John    151
20                  David Hansen and Ken Cohen,
                    dated 1/5/2017 through
21                  1/6/2017
22   Exhibit 11     Letter Agreement, dated        155
                    1/6/2016
23
     Exhibit 12     E-mail exchange between John    167
24                  David Hansen and John Stetson,
                    dated 4/28/2017
25
```

Page 7

1                         I N D E X
                         (Continued)
2
3                       E X H I B I T S
4    EXHIBIT NO.          DESCRIPTION                    PAGE
5    Exhibit 13    E-mail exchange, dated                173
                   4/30/2017 through 5/1/2017
6
     Exhibit 14    E-mail Exchange, dated                178
7                  6/29/2017 through 6/30/2017
8    Exhibit 15    Letter from MabVax to Mr.             192
                   Stetson, dated 8/9/2017
9
     Exhibit 16    MabVax SEC Form 8-K, dated            196
10                 5/21/2018
11   Exhibit 17    Board Meeting Minutes, dated          204
                   4/16/2018
12
     Exhibit 18    Verified Petition for Relief          209
13                 Under 8 Delaware Code 205
14   Exhibit 19    Letter from Oxford Finance,           218
                   dated 8/14/2018
15
     Exhibit 20    E-mail from Oxford, dated             223
16                 10/16/2018
17   Exhibit 21    Second Amended Complaint              235
18   Exhibit 22    Seeking Alpha Blog Post by            256
                   John Ford, dated 7/1/2015
19
     Exhibit 23    E-mail from John Ford, dated          259
20                 6/21/2015
21   Exhibit 24    Ford's Draft Article                  260
22   Exhibit 25    Ford's Draft Article with             262
                   Edits
23
     Exhibit 26    Additional Comments on Ford's         266
24                 Draft Article
25

Page 8

1                    I N D E X
                    (Continued)

2

3

4      QUESTIONS INSTRUCTED     PAGE     LINE
       NOT TO ANSWER

5
                                  77        6
6                                 77       21
                                 108        4
7                                211        4
                                 269        1

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                MONDAY, JANUARY 17, 2022

 2                     9:07 A.M.

 3

 4          THE VIDEOGRAPHER:  Good morning.  We are now on

 5    the video record at 9:07 a.m., on January 17th, 2022.

 6    This begins Media 1 in the remote video deposition of

 7    John David Hansen, taken in the matter of MabVax

 8    Therapeutics Holdings, Incorporated, versus Barry Honig,

 9    et al.  This case is filed in the Superior Court of the

10    State of California, in the County of San Diego.

11          This deposition is being held via Zoom video

12    conferencing.  My name is Jordan Bruce, and I'm the

13    videographer.  And the court reporter is Michelle

14    Bailey, both on behalf of Veritext.

15          Please note that all appearances will be noted

16    on the stenographic record.

17          And now would the court reporter please swear

18    in the witness.

19

20               JOHN DAVID HANSEN,

21            having first been duly sworn

22            by the reporter, was examined

23             and testified as follows:

24

25    ///
```

1    I may have to blow this up.  Make this a little larger.

2          Do you recall sending this e-mail on

3    August 25th, 2015, to Mr. Honig and Mr. Stetson?

4        A.  I don't remember exactly, but it is something

5    that I sent.  And I don't -- until I look at the date

6    here, I wouldn't know when I sent it.  But it was sent

7    on August 25th, yes.

8        Q.  Okay.

9          Now, I notice that in the "To" line, t-o colon,

10   of the e-mail, it's addressed to Mr. Honig and

11   Mr. Stetson, but then the first line of the body of the

12   e-mail says, "Dear Dr. Frost and Steve Rubin."

13       A.  Uh-huh.

14       Q.  Can you explain why that is, if you recall?

15       A.  Yes.  I was directed by Mr. Honig to draft an

16   e-mail that could be sent to Dr. Frost and Steve Rubin.

17       Q.  Okay.

18          So you drafted this e-mail having in mind that

19   it would be forwarded to Dr. Frost and Steve Rubin at

20   some point?

21          MR. ADAMS:  Objection.

22          THE WITNESS:  Yes.

23   BY MR. WEBER:

24       Q.  Okay.

25          On the second page under -- you see there's a

1  section, progress to date, there's a line that reads:

2  "Earlier" -- maybe the third sentence -- "earlier we

3  reported that a license to Juno would be completed

4  midyear."

5          Do you see that?

6      A.  Yes, I do.

7      Q.  Did you write that?

8      A.  Yes, I did.

9      Q.  Do you recall where -- you say "we reported."

10 Are you referring to MabVax when you use the pronounce

11 "we"?

12     A.  Yes.

13     Q.  Do you recall where MabVax reported that a

14 license with Juno would be completed midyear?

15     A.  I believe it would be in one of the amendments

16 to the options agreement which we filed, which would

17 have indicated that the June 30th date was the date

18 selected by Juno, at the time by which we would have the

19 license agreement completed.

20     Q.  Of course, I think you said -- well, strike

21 that.  You already testified.

22          I'm going to put this away.

23          How is MabVax introduced to Oxford finance?

24     A.  So in a -- let me back up.  There's a longer

25 explanation here, and I think you're going to have to

1    give me some time to explain.

2         So my understanding is is that a person by the

3    name of Chad Norman wrote an e-mail to Mr. Honig

4    indicating that he just left one debt financing firm,

5    Hercules, and had gone out and started his own firm.

6    And then an e-mail came back from Honig to Chad Norman

7    indicating that, well, why don't you give me a call.  I

8    might have an idea.  So there was apparently a call.

9         And then the next time I see an e-mail is

10   Mr. Honig saying that he would like this company that

11   Chad Norman is now affiliated with, Credo 180, to go

12   ahead and begin working on a debt financing for MabVax.

13   At this point in time, I did not know that Mr. Honig was

14   already contemplating debt financing for MabVax.

15        I then saw the e-mail train -- chain and talked

16   to Mr. Honig about it, and Mr. Honig told me that there

17   really wasn't a choice.  He wasn't going to give a

18   consent to further financing.  The only financing he

19   would give a consent to would be a debt financing.

20        He had then worked with Mr. Norman to carve out

21   or at least put together a term sheet for $10 million

22   debt financing.  And Mr. Norman's job was then, along

23   with his bank there, Credo, was to solicit interest from

24   a variety of financing firms.  So he ended up, under an

25   NDA with a variety -- I don't remember exactly the

1  number, but it was probably four, five, or six debt
2  financing firms, of which Oxford was one.  And Oxford
3  eventually was the only one that was willing to engage
4  in a substantive discussion regarding a debt finance.
5      Q.  Do you remember who the other debt financers
6  were with whom you had preliminary discussions?
7      A.  I don't remember the names.  What I do remember
8  is is that they were all mainstream large debt financing
9  firms.
10     Q.  And from where did you get that last of names?
11     A.  Those were proposed by either Mr. Honig or
12 Mr. Norman.
13     Q.  Would you consider Oxford to be a mainstream
14 large debt financing firm?
15     A.  Yeah, I would.
16     Q.  And who were your principal contacts at Oxford?
17 I mean -- by "you," I mean MabVax.
18     A.  There was both a local group and a corporate
19 group.  The local group was headed by a man by the name
20 of Chris Herr, and there a variety of people that
21 supported him locally.  The folks in the corporate that
22 eventually negotiated the license -- the debt financing,
23 I don't remember their names.
24     Q.  What discussions did you have with MabVax's
25 board of directors about entering into a debt financing

Page 139

1    agreement at that time.  And by "that time," I mean late

2    2015, early 2016.

3          A.  Well, I presented it to the board as it was

4    presented to me, which was this is the only path forward

5    to raise additional capital for the company; that Barry

6    had clearly indicated that he was not going to give his

7    consent to any other kind of financing; and that this

8    was it.  And he wouldn't give his consent to other kinds

9    of financing if we went outside of the investor group

10   that had the consent.

11         Q.  How did he make that clear to you, what you

12   just said?  Did he put --

13         A.  I believe --

14         Q.  Did he put it in a letter?

15         A.  I believe it's in an e-mail as well as

16   certainly telephone conversations.

17         Q.  Okay.

18             Ultimately, Oxford financed, extended a loan to

19   MabVax; correct?

20         A.  Correct.

21         Q.  And Oxford agreed to loan MabVax up to

22   $10 million; correct?

23         A.  Up to $10 million in two projects.

24         Q.  Right.

25             And what was the interest rate, if you recall?

Page 140

1      A.  Off the top of my head, I don't remember, other

2    than it was probably in the 10-plus percent range.

3      Q.  Okay.

4          And was there a term on the loan?  And by

5    "term," I mean the period of time by which it needed to

6    be repaid.

7      A.  If there was, I don't remember what it was.

8      Q.  Okay.

9          Was the loan secured by certain properties of

10   MabVax?

11     A.  Yes.  Pretty much all of our assets except for

12   the IP.

13     Q.  And there were various conditions that were

14   associated with the loan, including monthly reporting

15   that MabVax had to give Oxford and provision of

16   financial statements on a regular basis; correct?

17     A.  Yes.

18     Q.  Did the loan agreement contain a provision that

19   required MabVax to obtain Oxford's consent prior to

20   MabVax undertaking certain transactions?

21         MR. ADAMS:  Vague.

22         THE WITNESS:  Yes.

23         Sorry.

24         MR. ADAMS:  You can answer the question.

25   ///

Page 141

1   BY MR. WEBER:

2       Q.  I think the answer was "yes"?

3       A.  Yes.

4           MR. ADAMS:  You got to give me a moment to try

5   to spit it out before you answer.

6   BY MR. WEBER:

7       Q.  And what did you understand Oxford's consent

8   right to be?

9       A.  They could block transactions if they did not

10  give a consent to a particular financing that would

11  reduce the collateral against which the loan was made.

12      Q.  Okay.

13          So that would apply to any attempt by MabVax to

14  sell an asset which was collateralized by the loan?

15      A.  Yes.  That's right.

16      Q.  Did Oxford need to give consent to other

17  financing activities of MabVax?

18      A.  I do not believe so.

19      Q.  Now, Oxford did fund the first $5 million

20  tranche of that loan; correct?

21      A.  Correct.

22      Q.  Do you recall when MabVax received that

23  $5 million?

24      A.  It was early in the year.  I don't remember the

25  date.  But it was probably in the -- it could have been

Page 142

1    anywhere from early -- late January to sometime

2    February.

3         Q.  And in order for MabVax to receive the second

4    tranche of $5 million, there were two principal

5    conditions that needed to be met.  The first was that

6    MabVax needed to be listed on a national stock exchange;

7    correct?

8         A.  Correct.

9         Q.  And the second condition was that MabVax needed

10   to show positive interim data on its phase 1 trial;

11   correct?

12        A.  By September 30th.  Correct.

13        Q.  And that was the 5B1 trial; correct?

14        A.  Phase 1A of the 5B1 trial.

15        Q.  And that term -- those two terms that I just

16   asked you about, those were written into the actual

17   language of the loan agreement; right?

18        A.  Correct.

19        Q.  Now, MabVax did meet the first condition.  It

20   was listed on the MabVax stock exchange in August of

21   2016; right?

22            MR. SHAPIRO:  Objection.

23            THE WITNESS:  Correct.

24   BY MR. WEBER:

25        Q.  When did MabVax request Oxford to provide the

1   second tranche of $5 million?

2        A.  We began discussions with Oxford regarding the

3   second tranche, I remember, in September.  And we had

4   notified them that we had good data but that the -- we

5   weren't able to give a final conclusion to the phase 1A

6   clinical file until all the patients had gone through

7   all of the safety assessment.  So we would be late in

8   reporting out the clinical trial results.

9        Q.  When you said that you notified Oxford about

10  that, how -- in what manner did you provide that

11  notification?  What I mean by that was, did you send

12  them a letter?  An e-mail?  Anything in writing?

13       A.  Primarily, when we had our regular update

14  meetings with Oxford, which at that time were occurring

15  more frequently, we were -- in those update meetings, we

16  provide the financial information, and we'd also talk

17  about where we were with the clinical file and making

18  sure they understood where we were.  So those were

19  mostly verbal updates.

20       Q.  Did you send Oxford anything -- strike that.  I

21  was about to ask a terrible, objectionable question,

22  which I withdraw.

23          Did MabVax ever send Oxford in writing a

24  request to fund the second $5 million tranche of the

25  loan?

1      A.   To the best of my knowledge, no, we did not.

2      Q.   Okay.

3           Did MabVax orally ask Oxford to fund the second

4   tranche of $5 million of the loan?

5      A.   We were asking for that, yes, in the context

6   that we thought that we had good data and it would be

7   reported late.  And we were trying to make the case that

8   it would still be valid.

9      Q.   So when you say "we were asking for that," who

10  is the "we" who asked?

11     A.   Well, that was MabVax.

12     Q.   Who at MabVax?  What human beings?

13     A.   That would be myself and Mr. Hansen.

14     Q.   Greg Hanson?

15     A.   Yes.

16     Q.   Okay.

17          So you go had a -- were these meetings with

18  Oxford in person or on teleconference?

19     A.   Most by teleconference.

20     Q.   Okay.

21          So you and Greg Hanson were on a teleconference

22  with Oxford during which one of you asked Oxford to fund

23  the second $5 million tranche of the loan?

24     A.   I think the word should be -- go ahead.

25          MR. SHAPIRO:  I just want to say objection.

1           If you can answer the question, kindly do.

2           THE WITNESS:  Yes.  I think the word that we

3   would use was "consider."  Because we understood that we

4   would report data later than the September 30th time

5   point.  So we asked them to consider extending the -- or

6   funding the second tranche of the financing.

7   BY MR. WEBER:

8      Q.  Who at Oxford was on this phone call that

9   you're describing to me you?

10     A.  These were the local Oxford people, including

11  Chris Herr and a variety of others, but I can't give you

12  their names there today.

13     Q.  Well, you gave me Chris Herr.

14     A.  Yes.  I do remember him.

15     Q.  Is there any other person at Oxford whose name

16  you can recall that participated in telephone discussion

17  in which you and Mr. Hansen requested the additional

18  $5 million tranche of funds?

19     A.  Off the top of my head, I don't have their

20  names.  There were two others that I remember speaking

21  to frequently regarding all these updates.

22     Q.  Would Luke Pohlman be one of those people?

23     A.  Yes.  Now that you mention it, yes.

24     Q.  What about the Dave Hickman?

25     A.  Yes.  Those are the two that I remember.

1     Q.   Okay.

2          So were the two of them participants in the

3     telephone -- was it one telephone conference that you

4     were describing, or are there more than one in which --

5     A.   One --

6     Q.   Let me get the full question out.

7          -- in which you and Mr. Hansen asked Oxford to

8     fund the second $5 million tranche of the loan?

9     A.   Any others?  No.  Those would be the primary

10    ones.  And we would -- I think we started -- we started

11    to raise this question and ask for consideration

12    multiple times during multiple teleconferences during

13    the month of September.

14    Q.   What was Oxford's response?

15    A.   There was no answer.  The local folks had told

16    us that they were not in power to make the decision and

17    that that was a corporate decision and that they would

18    inquire with corporate.

19    Q.   And who was corporate, to your understanding?

20    A.   The folks that eventually we met with were the

21    chief credit officer and the COO of Oxford.  I don't

22    have their names right off the top of my head, but

23    those...

24    Q.   Credit officer and COO, when did you meet with

25    those people?

Page 147

1          A.   We got an e-mail message from I think it was

2     Dave Hickman asking if we could set aside time to meet

3     with these two folks in the very first few days of

4     November.  We hadn't received a official response from

5     Oxford at that point in time, even though we had

6     repeatedly asked.  And so we thought that all signs

7     pointed to this meeting to get a final answer from

8     Oxford on the tranche.

9          Q.   Okay.

10              And did that meeting occur by telephone or in

11    person?

12         A.   That was an in-person meeting.

13         Q.   Where was that?

14         A.   At MabVax's offices.

15         Q.   And who participated in that meeting?  Who

16    attended?

17         A.   That was Chris Herr, Dave Hickman, Luke

18    Pohlman, and the chief credit officer and the chief

19    operating officer from Oxford, as well as Greg Hanson

20    and myself and our director of finance.

21         Q.   Who was the director of finance?

22         A.   Jay Novak.

23         Q.   So -- and you believe that that meeting

24    occurred in November of 2016?

25         A.   Yeah.  Very early November 2016.

1      Q.  And by November of 2016, is it correct that

2    MabVax had not completed obtaining interim data on its

3    ongoing phase 1 trial?

4      A.  We made the public announcement on the data

5    from the trial on November 15th.  So it was just days

6    short.  But because of the rigor and the regulatory

7    requirements about putting an end point on clinical

8    trial, you can't say, oh, it's close and we'll report.

9    You have to finish.  So that's what was going on.

10     Q.  So what did you tell the folks from Oxford

11   about the state of the trial when you met with them in

12   early November 2016?

13         MR. SHAPIRO:  Objection.

14         THE WITNESS:  So at the -- by November, we

15   indicated to them that we thought that we would be able

16   to produce a public document which was required in the

17   loan terms on a successful phase 1A clinical trial very

18   shortly.

19   BY MR. WEBER:

20     Q.  And what was their response to that?

21     A.  Their response was that they were going to

22   decline funding the second tranche for three reasons.

23   And the reasons are that, number one, according to them,

24   that MabVax was too thinly capitalized for them to

25   become the major lender for MabVax.  Their feeling was

1   that they're not in the venture capital business.

2   They're in the debt business.  So the end capitalization

3   did not allow them to be comfortable to make that.

4        The other reason was that they had had

5   interactions with Mr. Honig, and they were very

6   uncomfortable making the second -- funding the second

7   tranche and not being able to count on Mr. Honig to

8   provide consent when needed for subsequent financing.

9        And, finally, to cap all that off, we were

10  conveniently late on reporting out the clinical trial

11  results, which gave them the opportunity to decline.

12      Q.  And they told you this at the meeting?

13      A.  Yes, they did.

14      Q.  I'm going to put a -- sorry.

15          MR. WEBER:  I've marked a document as

16  Exhibit 9, which will come up on your screen in a moment

17  here.  There we go.

18          (Exhibit 9 marked)

19  BY MR. WEBER:

20      Q.  Do you see this?

21      A.  I do see it.

22      Q.  Okay.

23          Have you seen this document before?

24      A.  Can you scroll down to the bottom to see if my

25  name is on the bottom?

Page 150

1      Q.   Absolutely.

2      A.   Yeah.   Here we go.

3      Q.   Is that your signature?

4      A.   Yep.

5      Q.   Okay.

6           Is this a letter that you sent to shareholders

7   in September 2016?

8      A.   Yes.

9      Q.   Okay.

10          And was this letter also filed with the SEC as

11  an attachment to a form ADK?

12     A.   I believe so.   I think that what I see at the

13  bottom is an SEC web location.

14     Q.   That's correct.   Just a little bit above your

15  signature, do you see there's six bullet points?

16          Do you see those?

17     A.   Yep.

18     Q.   Again, the last bullet point here, you wrote

19  that MabVax had 12 months' operating capital to complete

20  phase 1 milestones.

21          Do you see that?

22     A.   Yes, I do.

23     Q.   Did that presume that MabVax was going to

24  receive the second tranche of $5 million from Oxford?

25     A.   No.

1      Q.  No, it didn't?

2      A.  No, it didn't.

3      Q.  So MabVax thought, or you thought, as of

4    September 2016, that MabVax had 12 months' operating

5    capital?

6           MR. SHAPIRO:  Objection.

7           THE WITNESS:  Yep.  Yes.

8    BY MR. WEBER:

9      Q.  How much was 12 months operating capital at

10   that time?

11     A.  Off the top of my head, I can't tell you that.

12   I am familiar that there is a document that has just

13   that in it.  With footnotes on the financial plan going

14   forward.  So you'd have to bring up that document or

15   just accept the fact that I can't be precise.

16     Q.  Well, I'm going to accept the fact that you

17   can't be precise because I'm not sure what document

18   you're referring to.  But that's okay.

19           I'm going to show you another document.  Give

20   me a minute here.  Give me a moment, sir.

21           MR. WEBER:  Okay.  I've marked a document as

22   Exhibit No. 10.  I will get it up on the screen as soon

23   as I can, assuming Exhibit Share will let me.

24           Here it comes.  Okay.

25           (Exhibit 10 marked)