# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BARRY C. HONIG, GRQ CONSULTANTS, INC., GRQ CONSULTANTS, INC. 401K, GRQ CONSULTANTS, INC. ROTH 401K FBO BARRY HONIG, GRQ CONSULTANTS, INC. ROTH 401K FBO RENEE HONIG, HS CONTRARIAN INVESTMENTS, LLC, ROBERT S. COLMAN, and ROBERT S. COLMAN TRUST UDT 3/13/85, | Case No. 1:20-cv-05872-AKH-SN |

Plaintiffs,

v.

JOHN DAVID HANSEN and GREGORY P. HANSON,

Defendants.

~~FOURTH~~[PROPOSED] FIFTH AMENDED COMPLAINT

Plaintiffs Barry C. Honig ("Honig"), GRQ Consultants, Inc., GRQ Consultants, Inc. 401K, GRQ Consultants, Inc. Roth 401K FBO Barry Honig, GRQ Consultants, Inc. Roth 401K FBO Renee Honig (together, the "GRQ Entities"), HS Contrarian Investments, LLC ("HSCI" and together the "Honig-Related Entities"), Robert S. Colman ("Colman"), and the Robert S. Colman Trust UDT 3/13/85 (the "Colman Trust" and altogether, the "Plaintiffs") by and through their attorneys, hereby file this ~~Fourth~~Fifth Amended Complaint against Defendants John David Hansen and Gregory P. Hanson (collectively, "Defendants") and allege as follows.

Plaintiffs' allegations are based on personal knowledge as to themselves and their actions, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, the investigation of their undersigned counsel, which includes without limitation: (a) review and analysis of regulatory filings made by MabVax Therapeutics Holdings, Inc. ("MabVax" or the "Company") with the United States Securities and Exchange Commission; (b) review and analysis of press releases and media reports issued by and

disseminated by MabVax; (c) review and analysis of communications from the relevant period between Plaintiffs, Defendants, and third parties; (d) communications between Plaintiffs and third parties; ~~and~~ (e) sworn testimony of MabVax officers that occurred in January, February and April 2022 and (f) review of other publicly available information concerning MabVax, including but not limited to its March 21, 2019 bankruptcy petition filed in federal court.

## NATURE OF THIS ACTION

1.      Plaintiffs in this action are long-time, loyal investors in MabVax, a publicly traded ~~early-stage~~, clinical-stage biotechnology company. ~~From 2016 to 2018,~~ MabVax focused principally on the development of a human monoclonal antibody as a potential therapy to treat pancreatic cancer. Its lead antibody program centered around the HuMab-5B1 antibody (also designated "MVT-5873"), which is fully human and discovered from the immune response of cancer patients vaccinated with an antigen-specific vaccine.

2.      MabVax never had a saleable product, and generated *di minimis* revenues. Despite that, its principal officers, Defendants John David Hansen~~,~~ (President, CEO, and Chairman of the Board of MabVax ~~("Hansen")~~, and Gregory P. Hanson~~, the~~ (Chief Financial Officer ~~("CFO")~~ of MabVax ~~("Hanson") duped the Plaintiffs into making additional investments into MabVax by knowingly and intentionally making material misrepresentations and omissions that were relied upon by the Plaintiffs in connection with investment decisions and the subject of which caused Plaintiffs' economic loss.~~

~~2.~~ ), milked the Company ~~Defendants knowingly and willfully misled the Plaintiffs to secure and retain Plaintiffs' investments in order for Defendants to keep MabVax financially afloat and sustain their staggeringly high compensation. From September 2016 to 2018, Plaintiffs invested over $4,900,000 in MabVax based upon and in reliance upon Defendants' material~~

~~misrepresentations and omissions~~<u>for massive compensation</u>. From just 2016 to 2018, Defendants' total combined compensation including salary, equity grants, and other benefits was over $5,200,000[1]~~,~~ a number vastly higher than the average compensation for similarly situated executives of early-stage companies, and much more reflective of companies in the Russell 2000 with assets between 10 and 125 times the amount of MabVax.[2]

~~3. MBVX earned no significant revenues during the tenure of Hansen and Hanson. Both Hansen and Hanson repeatedly drew compensation out of MabVax that represented a material percentage of the net financing capital provided by outside investors:~~

| | ~~Net Cash Provided by financing activities~~ | ~~J. David Hansen Compensation~~ | ~~Greg Hanson Compensation~~ | ~~% of Net Financing~~ |
|---|---|---|---|---|
| ~~2015~~ | ~~$13,210,540~~ | ~~$4,183,665~~ | ~~$2,217,222~~ | ~~48.45%~~ |
| ~~2016~~ | ~~$12,821,812~~ | ~~$989,257~~ | ~~$453,602~~ | ~~11.25%~~ |
| ~~2017~~ | ~~$7,923,003~~ | ~~$2,165,915~~ | ~~$848,201~~ | ~~38.04%~~ |
| ~~2018~~ | ~~$2,686,478 (through Q3 2018)~~ | ~~$430,000~~ | ~~$317,386~~ | ~~27.8%~~ |

---

[1] According to public filings, in 2016, Hansen caused MabVax to compensate him $989,257 ($418,438 salary, $141,400 bonus, $393,702 options, $35,717 "other comp"). In 2017, Hansen caused MabVax to compensate him $2,165,915 ($427,876 salary, $448,500 in stock, $1,252,905 options, $36,634 "other comp"). In 2018, Hansen caused MabVax to pay him a salary of $430,000. In 2016, Hanson caused MabVax to compensate him $453,602 ($276,014 salary, $62,790 bonus, $99,743 options, $15,055 "other comp"). In 2017, Hanson caused MabVax to compensate him $848,201 ($309,312 salary, $277,016 stock, $224,945 options, $36,928 "other comp"). In 2018, Hanson caused MabVax to pay him a salary of $317,386. ~~Unfortunately, different public filings by MabVax include different compensation numbers for the Defendants.~~

[2] For example, in "The BDO 600", a 2016 survey of CEO and CFO compensation practices, BDO found that the average compensation paid to CEOs of companies with $100M to $500M revenues and $1.25B in assets was $2,324,230 in 2015, similar to Hansen's 2017 total compensation of $2,165,915. For CFOs, BDO found the average total compensation was $964,824, similar to Hanson's 2017 total compensation of $848,201. Of course, MabVax's revenues and assets were nowhere close to $100M.

3.      In order to fund their outsized salaries and fund MabVax's development efforts, Defendants needed to continually raise financing dollars from outside investors, including Plaintiffs. From 2016 to 2018, Hansen and Hanson duped the Plaintiffs into making investments into MabVax by knowingly and intentionally making material misrepresentations and omissions that were relied upon by the Plaintiffs in connection with investment decisions and the subject of which caused Plaintiffs' economic loss.

4.      Specifically, Defendants have a history of concealing material information from Plaintiffs, which they knew would be relied upon, for the purpose of attaining investments to finance their salaries. repeatedly lied to Plaintiffs and other investors about the interim results of MabVax's Phase I clinical trial of its lead therapeutic antibody, HuMab-5B1 (MVT-5873).

5. For example, at the same time that they were using Plaintiffs' money to fund their excessive compensation, Defendants were actively concealing material non-public information from Plaintiffs while providing that same information to select other investors. As will be explained in greater detail, MabVax entered a senior secured debt financing with Oxford Finance LLC pursuant to which Oxford would loan MabVax an initial $5 million, and later provide a second tranche of $5 million if MabVax's antibody trial showed positive results. When MabVax failed to produce positive results, Oxford refused to loan MabVax the second $5 million. MabVax and Defendants knew about but concealed from Plaintiffs the poor interim results of the trial (which was obviously sufficient enough to scare Oxford from funding the second tranche of its loan), and further, MabVax and Defendants lied to Plaintiffs and other investors by telling them that the timeline for the second Oxford loan had merely expired — omitting that in reality Oxford had rejected MabVax's request for a second loan based on information disclosed only to Oxford.

6. Another example of Defendants' fraud arose in early 2018, when MabVax suspended patient enrollment in the Phase 1 clinical trial of its principal therapy due to an "adverse event" involving a trial participant. Defendants and MabVax purposefully did not timely disclose this "adverse event," nor did they disclose that the Phase 1 trial was suspended. Instead, MabVax and Defendants continued to publicly report that the Phase 1 trial "continued to yield encouraging results" and that the company was "encouraged with the positive data." MabVax and Defendants were fully aware of, and intentionally omitted, the fact of patient suspension and the adverse event. MabVax and Defendants did so at a time when MabVax was desperately short on cash and would have run out of money and folded without fresh investment. Induced by the false statements regarding the clinical trial, Plaintiffs purchased additional MabVax securities during 2018.

5.     The purpose of the Phase I clinical trial, which MabVax initiated in February 2016, was to establish the safety of, and patient tolerability to, MabVax's antibody. MabVax hoped to achieve those goals by conducting a two-part trial.

6.     In the first part, variously described by the Defendants as "Phase 1a" or the "Monotherapy trial," three-person cohorts of patients were administered the antibody to identify a safe "Maximum Tolerable Dose." This was done by progressively increasing dosages for each cohort until Dose Limiting Toxicities were noted; i.e. side effects from the treatment that are sufficiently serious to deter further increases in dose level. Clinical trials typically determine a "Maximum Tolerable Dose" as being the dose level immediately below the Dose Limiting Toxicity.

7.     In the second part of MabVax's Clinical Trial, variously described by the Defendants as "Phase 1b" or the "Combination trial," cohorts of patients were administered the Maximum Tolerable Dose of the HuMab-5B1 (MVT-5873) antibody in combination with the

"standard of care" (*i.e.*, medically standard) chemotherapy treatment (nab-paclitaxel and gemcitabine), to determine safety and tolerability. Hereafter, the two parts of the trial are referred to together as the "Clinical Trial."

8.     From the start, the Clinical Trial ran into material safety problems. As early as June 2016, Patients started to encounter a disturbingly large number of adverse events, and in particular, "severe" adverse events. An "Adverse Event" is any untoward medical occurrence associated with the use of a drug in humans. A "Severe Adverse Event" is an adverse event that is evaluated as Grade 3 or higher Under the Common Terminology Criteria for Adverse Events ("CTCAE"), published by the US Department of Health and Human Services. The Adverse Events that arose in MabVax's Clinical Trial included patients encountering Dose Limiting Toxicities at every dose above the lowest dose administered to patients. By their definition, Dose Limiting Toxicities preclude calling a drug at that dose "safe" or "well-tolerated."

9.     Thirty-two patients participated in Phase 1a of MabVax's Clinical Trial between March 2016 and May 2017. Those thirty-two patients encountered an astounding 172 Adverse Events, including liver damage, anemia, hyperglycemia, and a number of other concerning side effects. At least twenty-seven of the Adverse Events encountered by patients in the Phase 1a part of the Clinical Trial were graded "Grade 3 – Severe" or "Grade 4 – Life-Threatening."  At least nine patients encountered Dose Limiting Toxicity that required reducing the dose, delaying treatment or discontinuing their treatment altogether. Overall, approximately half of the patients in the Phase 1a/Monotherapy trial experienced Grade 3 or Grade 4 Adverse Events.

10.     Defendants did not disclose to Plaintiffs and other investors the high prevalence of Severe Adverse Events (Grade 3) or Life Threatening Events (Grade 4) encountered by patients during the Phase 1a part of the Clinical Trial during 2016 and 2017. To the contrary,

Defendants hid that bad news from investors, and instead issued numerous false and misleading press releases and SEC filings which represented that interim results of Phase 1a of the Clinical Trial were **"positive"** and that "**safety was established.**" Defendants made those false and misleading statements to induce Plaintiffs and others to purchase millions of dollars of MabVax securities.

11.     In November 2016, MabVax commenced the second part of its clinical trial, in which the HuMab-5B1 (MVT-5873) was administered to patients in combination with the standard of care chemotherapy. MabVax proceeded with this portion of the Clinical Trial, even though it had not yet established the Maximum Tolerated Dose of its antibody and would not do so until the second quarter of 2017.

12.     The initial results in that "Phase 1b" or "Combination Trial" demonstrated even greater toxicity compared to the results from Phase 1a. During late 2016 and early January 2017, the first three patients encountered a massive number of adverse events – 24 in total – shortly after starting treatment. Seven of those Adverse Events were graded Grade 3 (Severe) or Grade 4 (Life Threatening), with most occurring within days of the commencement of treatment.

13.     The patients' reactions to the Phase 1b Combination trial was so bad that the treatment of all three patients in the initial cohort was discontinued within a few weeks of starting. In an attempt to protect the next cohort of patients from Severe Adverse Events, MabVax decided to reduce the dosage of the antibody administered to subsequent patients **by a factor of eight.**

14.     But reducing the dosage to patients in the second cohort of the Phase 1b trial did not alleviate the safety problems. In early 2017, two of the first three patients treated with the reduced dosage in the Combination Trial developed Grade 3 (Severe) pneumonitis, an

inflammation of lung tissue that had the potential to cause irreversible lung damage. Two more patients in a still later cohort of the Combination Trial developed Grade 3 (Severe) and Grade 4 (Life Threatening) pneumonitis, causing MabVax to completely **shut down** the Clinical Trial.

15.     Even though nearly all of the initial cohorts of patients in the Phase 1b Combination Trial suffered severe or in some cases life-threatening Adverse Events by the beginning of June 2017, and Defendants knew those facts, Defendants hid those facts from Plaintiffs and other investors. Instead, Defendants repeatedly trumpeted in press releases and SEC filings throughout 2017 and 2018 that MabVax's antibody treatment was "safe" and "well tolerated" by patients, and that interim results were "positive" and "promising."

16.     Defendants knowingly and willfully misled the Plaintiffs about the progress of the Clinical Trial to induce Plaintiffs to invest millions of dollars into MabVax to keep the Company financially afloat and sustain Defendants' staggeringly high compensation. From May 2017 to May 2018, Plaintiffs invested over $4,900,000 in MabVax based upon and in reliance upon Defendants' material misrepresentations and omissions regarding the Clinical Trial.

17.     Even after MabVax was forced in 2018 to **shut down** the Clinical Trial due to the prevalence of Severe Adverse Events suffered by patients, Defendants did not disclose that development for months. When Defendants finally disclosed that fact in October 2018, they tried burying the news. Unlike their misrepresentations regarding "positive" Clinical Trial results, which MabVax highlighted in numerous stand-alone press releases, the news that the Clinical Trial had been suspended was contained in a single sentence, appearing on page 30 of a Quarterly Report, which report was belatedly filed with the SEC five months after it was due – an indication that Defendants knew how concerning this development was.

18.     Following that disclosure, MabVax was unable to raise any material financing, and within less than six months it filed for bankruptcy.

19.     7. Today, while MabVax investors have lost money on their investments, and MabVax is in bankruptcy, Defendants have walked away with millions of dollars in various forms of compensation and brand new consulting agreements. Through the Bankruptcy proceedings, Defendants sold MabVax's proprietary technology to another company, and secured for themselves consulting agreements with that same company.

20.     8. Had Defendants not actively lied to Plaintiffs and concealed material information, Plaintiffs would not have invested millions of additional nearly five million dollars into MabVax during 2017 and 2018 and would not have suffered the significant losses and damages that they have now incurred. Plaintiffs accordingly sue Defendants directly to recover their damages for Defendants' fraud.

## JURISDICTION AND VENUE

21.     9. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and more than $75,000 is at issue, exclusive of interest, costs and fees.

22.     10. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

23.     11. Personal jurisdiction over Defendants exists because Defendants regularly engaged in business and transacted business in New York, as discussed below, and because Defendants have consented to personal jurisdiction in New York.

24.     12. Numerous investment documents, including the August 11, 2017 Securities Purchase Agreement and April 27, 2018 Securities Purchase Agreement, among others,  signed by the Plaintiffs in connection with their MabVax investments state, in sum or substance:

Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.

25.   13. Several of the investment documents signed by the Plaintiffs make

clear that this forum-selection clause applies to claims "whether brought against a party

hereto or its respective affiliates, directors, officers, shareholders, partners, members,

employees or agents", which includes Defendants.

26.   14. During the relevant period, Defendants met with Honig, on behalf of himself

and the Honig-Related Entities, and other investors in New York, New York on several

occasions to solicit investments from Honig, other investors, and the Honig-Related Entities that

are at issue in this action. Thus, the causes of action here arise from the investment documents

making clear that New York is the appropriate forum, and the causes of action arise in part from

these solicitations, which took place in New York. Moreover, MabVax, at Defendants' direction,

regularly transacted business in New York, and entered into agreements with entities in New

York, including with Cold Spring Harbor Laboratory, a nonprofit New York State education

corporation, and Y-MABSY-mAbs Therapeutics, Inc., which has a principal place of business in

New York, New York. An investigative site for MabVax's clinical trials was Memorial Sloan

Kettering Cancer Center in New York City.

## PARTIES

27.   15. Plaintiff Barry C. Honig ("Honig") is a citizen of Florida, resident in Boca

Raton and Palm Beach County Florida. He purchased shares of MabVax common and preferred

stock and warrants, including in the Series M and N Private Placement Financings, and was damaged thereby.

28. ~~16.~~ Plaintiff GRQ Consultants, Inc. ("GRQ") is a Florida corporation with its principal place of business in Palm Beach County, Florida, and thus a Florida citizen. GRQ is solely owned by Florida citizen Honig and was operated by Florida citizen Honig during the relevant period.[3] It is the plan administrator for Plaintiffs GRQ Consultants, Inc. Roth 401k FBO Barry Honig, GRQ Consultants, Inc. Roth 401k FBO Renee Honig, and GRQ Consultants, Inc. 401k, all of which retirement plans were established in Florida and the beneficiaries of which are entirely citizens of Florida.

29. ~~17.~~ Plaintiff HS Contrarian Investments, LLC ("HSCI") is a Delaware limited liability company, with its principal place of business in Broward County, Florida.  Non-party John Stetson ("Stetson") is the managing member of HSCI. Stetson is a natural person who resides in Broward County, Florida and is a citizen of Florida. Florida citizen Honig is the only other member of HSCI. HSCI is a citizen of Florida.

30. ~~18.~~ Plaintiff Robert S. Colman ("Colman") is a citizen of Idaho who resides in Ketchum, Idaho.  He purchased shares of MabVax common and preferred stock and warrants, including in the Series M and N Private Placement Financings, and was damaged thereby.

31. ~~19.~~ The Robert S. Colman Trust UDT 3/13/85 is a revocable trust formed under the laws of the State of Idaho and is based in Idaho.  Plaintiff Colman, an Idaho citizen, is the sole trustee and sole beneficiary of the Robert S. Colman Trust UDT 3/13/85.

32. ~~20.~~ Defendant John David Hansen ("Hansen") was, at all relevant times, President, CEO, and Chairman of the Board of Directors of MabVax. Hansen signed many of

---

[3] Alan Honig is the current President of GRQ.

MabVax's public filings ~~including the January 30, 2018 Form 8-K, its February 6 and May 3, 2018 Form 8-Ks announcing the Series M and N Private Placement Financings~~ as detailed below. He is a California citizen and resident. Hansen personally solicited the Plaintiffs, within and outside of California, on multiple occasions to make investments into the Company. Hansen also had personal knowledge of all the relevant material non-public information and was responsible for public disclosures.

      33.    ~~21.~~ Defendant Gregory P. Hanson ("Hanson") was, at all relevant times, the Chief Financial Officer ("CFO") of MabVax. Hanson signed many of the SEC filings ~~at issue here~~ as detailed below, and was the MabVax officer who primarily corresponded by phone and email with Plaintiffs. He is a California citizen and resident.

## STATEMENT OF FACTS

      34.    ~~22.~~ MabVax was originally incorporated in Delaware in 1988 under the name Terrapin Diagnostics, Inc. It was renamed Telik, Inc., in 1998, and changed its name to MabVax in September 2014 as a result of a merger with MabVax Therapeutics, Inc. At all times relevant to this complaint, MabVax was publicly traded.[4] As a Delaware registered company, the Company, and its officers and directors are subject to the fiduciary provisions of the Delaware General Corporate Law.

      35.    ~~23.~~ Because MabVax was a publicly traded company, it regularly made public filings to the SEC. Plaintiffs regularly and routinely reviewed and relied on those public filings, which were signed by Hansen and Hanson in California. As executives of a publicly traded

---

[4] Plaintiffs also made certain investments in MabVax in 2014 before it became publicly traded ~~. Those~~, and in 2015 and 2016 prior to the acts alleged herein. Those earlier investments are not at issue in this complaint.

company, Defendants knew that investors, including Plaintiffs, would read and rely on MabVax's public filings.

36.   24. Throughout 2014, 2015, 2016, 2017, and 2018, MabVax regularly described itself in public documents as a "clinical-stage biotechnology company focused on the development of antibody-based products and vaccines to address unmet medical needs in the treatment of cancer."

37.   25. Plaintiffs began investing in MabVax in early 2014, before it became publicly traded. By January 1, 2016, Plaintiffs had invested millions of dollars. By that point, Defendants had repeatedly solicited Plaintiffs for investments.

38.   26. During 2017 and 2018, MabVax continually reduced full-time employee headcount from approximately twenty-four to only six employees, of which Defendants at all times were the principal two. Given the tiny size of MabVax, Defendants were intimately familiar with all of the material operations of the company, including the status of its important clinical trialsClinical Trial, and the issuance of information to the public about those trialsthat Clinical Trial.

39.   27. As is quite often the case, Plaintiffs invested in a company (MabVax) where they were not experts in the field it operated in. Because of this, among other reasons, Defendants knew that investors, such as Plaintiffs, would and did rely on public filings by the Company, the views of sophisticated institutional investors, and statements of the Company's officers and directors, and that Plaintiffs would expect such public filings, views and statements to be complete and truthful.

I.   *Omissions Regarding the Oxford Loan*

a.   **MabVax's Financial Position Was Precarious.**

40.     MabVax was a clinical stage company with *de minimis* revenues, but large expenses. MabVax relied on outside financing to keep it operating until its therapy was either sold or licensed to other companies, or progressed through three stages of clinical trials until it was approved by the FDA so that it could reach the consumer market. If MabVax ran out of financing, it would cease to exist. Defendants, as experienced executives of a publicly traded early-stage biotechnology company, knew this.

41.     According to MabVax's Annual Report for the year ended December 31, 2015, at the end of 2015 the Company only had approximately $4 million of cash and cash equivalents on hand. In 2015, the Company had total operating expenses over $19 million. The Company reported that it expected to continue losing money for "at least the next several years," and was dependent on raising additional financing to fund operations. The Company's independent auditor stated in its March 14, 2016 audit report that those "conditions raise substantial doubt about the Company's ability to continue as a going concern."

42.     Thus, to entice outside investors to provide additional financing to fund the Company and Defendants' ongoing salaries, it was crucial that Defendants issue a consistent stream of "good news" about MabVax's efforts.

### b.  ~~a.~~ The Importance of HuMab-5B1 (MVT-5873) to MabVax.

43.     ~~28.~~ MabVax's HuMab-5B1 (MVT-5873) antibody was at the center of its and Defendants' campaign to attract investors, including Plaintiffs. On July 31, 2015, MabVax referred to HuMab-5B1 (MVT-5873) as its "lead antibody development program". MabVax public filings between May and August 2016 stated that MabVax was "substantially dependent on the success of our product candidates, HuMab-5B1 and 89ZR-HuMab-5B1".

44. ~~29.~~ Defendants constantly issued statements about, and kept themselves constantly informed about, the current status of the company's HuMab-5B1 ~~clinical trials.~~(MVT-5873) Clinical Trial. For instance, from early 2016 until mid-2018 Defendant David Hansen participated in meetings every other week in which the status of each patient in the Clinical Trial was discussed in detail with the doctors who were treating those patients.

45. ~~30.~~ Because HuMab-5B1 (MVT-5873) was MabVax's "lead antibody development program~~"~~," Defendants knew that results from ~~its HuMab-5B1 antibody trial in pancreatic cancer ("Phase 1")~~the Clinical Trial were material to investors, including the Plaintiffs. MabVax's consistent release of updates regarding the ~~Phase 1 clinical trials for HuMab-5B1 (for example, MabVax released statements on December 1, 2015, January 28, 2016, March 18, 2016, March 21, 2016, and May 9, 2016)~~Clinical Trial further show Defendants' knowledge regarding ~~Phase 1's~~the trial's materiality to investors, as ~~Phase 1~~the Clinical Trial results directly went to MabVax's ability to continue as a going concern. Without positive Phase 1 data, MabVax would not be able to solicit future investment because MabVax would, in essence, not have a viable product. The success or failure of the ~~Phase 1 trial~~Clinical Trial was paramount to MabVax's success, and any negative results were absolutely material to all investors, including Plaintiffs.

46. ~~31. In fact, as~~As Defendant Hansen publicly acknowledged, any results, including interim results, from the ~~Phase 1 trial~~Clinical Trial were material to investors, including Plaintiffs. In an interview with "Stock News Now" on August 22, 2016, which was published on YouTube on September 6, 2016, Hansen stated the following regarding early interim results of the ~~Phase 1 trial~~Clinical Trial:

> But we also thought that it was important to give patients and investors and potential partners an early glimpse into what we're seeing, provided that

we're seeing something substantial and important, something that we can look back on and say, "yes we validated that". And so we're looking for, somewhere in the third quarter of this year, so not very far away, probably in the month of September, we think we'll have enough patients enrolled in each of those trials to say something about where we are and where we're headed, and *we think those will be a very important sort of interim milestone*. (emphasis added)

32. Hansen also acknowledged the importance of the results from the Phase 1 trial by causing MabVax to publish them in public filings. In an S-1 filed on August 3, 2016, which was signed by Hansen, MabVax stated the following regarding the Phase 1 results:

In the dose escalation portion of the trial, patients enrolled have locally advanced or metastatic pancreatic cancer who have failed other therapies. Nine patients treated to date have been observed as tolerating initial dosages of the drug reasonably well. Infusion reactions, which are not uncommon with protein drugs, have been the most frequent adverse events related to drug exposure and have been addressed by slowing the infusion rate. Of the nine patients who have been dosed to date, five have been treated for three or more months and investigator observations have noted stable disease for a subset of those patients.

33. As Defendants knew, although the HuMab-5B1 antibody trial Phase 1 results were material to investors, investors without a sophisticated understanding of the science behind MabVax's antibody program, including Plaintiffs, had no basis to understand whether these results were promising or catastrophic to MabVax's future. Because five of nine patients that had "locally advanced or metastatic pancreatic cancer who ha[d] failed other therapies" were apparently treated for "three or more months" with notations of "stable disease" Plaintiffs believed (and relied on their belief) that the results were positive.

34. In a press release published on September 19, 2016, MabVax published further Phase 1 results. Among other things, the press release stated:

"To date 13 patients, most with stage 3 and 4 metastatic pancreatic cancer, have been enrolled after having exhausted all other standard of care therapies," stated President and CEO J. David Hansen. "Based on assessments conducted with available unaudited data to date from these patients, we are seeing a pharmacokinetic profile for MVT-5873 that is similar to other monoclonal antibody therapeutics. We are actively dosing patients and plan on generating sufficient

~~safety data in this portion of the phase I trial to allow the initiation, during the fourth quarter of this year, of the second part of the phase I trial where MVT-5873 will be administered in front line~~ therapy in combination with a current standard of care chemotherapy".

47.   ~~35. Again, as~~ Defendants knew~~,~~ that although the ~~Phase 1~~Clinical Trial results were material to investors, ordinary investors, including Plaintiffs, had no basis, other than MabVax's routine positive reporting, to understand whether these results were promising or catastrophic to MabVax's future.

48.   ~~36.~~ Thus, Defendants knew that Plaintiffs relied ~~entirely~~ on Defendants' public statements ~~and the analysis of sophisticated institutional investors~~ in determining whether the ~~Phase 1~~Clinical Trial results were promising to MabVax's future. Defendants also knew that Plaintiffs' continuing faith, and willingness to invest in MabVax, was predicated on Defendants' representations that the interim results indicated the treatment was "safe" and "promising," ~~Phase 1 results~~and were indicative of the future health and profitability of MabVax. It was clear that negative ~~Phase 1~~Clinical Trial results would cause significant financial hardship for MabVax.

### c.   ~~b.~~ The ~~Oxford Loan~~Troubled Clinical Trial.

49.   On December 1, 2015, Defendants caused MabVax to file a Form 8-K with the SEC, which attached a MabVax press release from the same day. The 8-K and press release announced that MabVax had filed an Investigational New Drug Application ("IND") with the U.S. Food and Drug Administration ("FDA") for the HuMab-5B1 (MVT-5873) antibody as a therapeutic agent. The press release stated that, subject to FDA acceptance, MabVax planned to initiate a Clinical Trial early in 2016, with Phase I of the trial proceeding in two parts as follows:

> The planned Phase I trial will evaluate the safety, tolerability and pharmacokinetics of HuMab 5B1 as a single agent or in combination with the current standard of care chemotherapy regimen in subjects with metastatic pancreatic cancer.  The first cohort of patients to be enrolled in the planned clinical trial will be enrolled in a

traditional dose escalation regimen to assess safety and determine the optimal dose of the antibody. A second patient cohort will establish the safety and optimized dose of the antibody when administered with standard of care chemotherapy.

50.    The December 1, 2015 press release included a quote from Defendant Hansen, in which he described the filing of the IND as "a significant achievement for MabVax.  Pending FDA acceptance of the IND, we will begin the dose escalation portion of this Phase I trial as early in 2016 as possible and anticipate reporting on the early safety assessment and determination of a maximum tolerated dose in mid-year 2016. Achievement of this important interim milestone will enable us to move into the combination therapy and monotherapy portions of the trial where we could learn much more about the pharmacological effects of this new therapy."

51.    On January 4, 2016, the Defendants caused MabVax to issue a press release announcing that it had received notice from the FDA authorizing initiation of the Clinical Trial.

37. According to a January 19, 2016 8-K, on January 15, 2016, MabVax and Oxford Finance LLC ("Oxford"), as collateral agent and lender, entered into a Loan and Security Agreement (the "Loan Agreement") providing for senior secured term loans to the Company in an aggregate principal amount of up to $10,000,000, subject to the terms and conditions set forth in the Loan Agreement. Under the Loan Agreement, the Company received an initial loan of $5,000,000.

38. In order for MabVax to receive the second tranche of $5,000,000, two conditions needed to be met. *First*, MabVax needed to be listed onto the NASDAQ Stock Market or New York Stock Exchange. *Second*, MabVax needed "*positive interim data on the Phase 1 [trial]*". (*See* Ex. 10.1 to January 19, 2016 8-K.)

39. MabVax's ability to get the second tranche of $5,000,000 would expire on September 30, 2016.

40. Oxford was a sophisticated institutional investor. As explained on Oxford's website:

For over 20 years, Oxford Finance has enjoyed a reputation for being far more than a lending institution. Our success is founded upon enduring relationships within an industry we know intimately well. Clients and partners alike value our deep expertise, our drive to share success, and the service and flexibility we have provided to hundreds of life sciences and healthcare services companies across the globe. In recent years, Oxford has originated over $6 billion in loans, with credit facilities ranging from $5 million to $150 million.

41. For this reason, Plaintiffs eagerly awaited Oxford's decision regarding whether to provide the second tranche of $5,000,000 to MabVax. If Oxford rejected MabVax's request, that would mean, despite MabVax's regular positive reports, that there was not "positive interim data on the Phase 1 trial" — an indictment of MabVax's "lead antibody program" that would be catastrophic for the Company's prospects and ability to get future financing.

42. Upon information and belief, Defendants knew that investors, including Plaintiffs, awaited Oxford's decision and were prepared to rely on it in either further investing in MabVax or refusing to invest and instead sell their shares. The Loan Agreement was constantly referenced in MabVax's public filings, which were signed by Hansen, and Hansen in California discussed it publicly (as shown below).

52. 43. On August 17 March 21, 2016, the first condition was met — MabVax announced its listing on the NASDAQ Stock Exchange in a public filing. Thus, Plaintiffs, like all of MabVax's investors, understood that if there was "positive interim data on the Phase 1", MabVax would receive the second tranche of $5,000,000 from Oxford. Defendants caused MabVax to issue a press release from its headquarters in California, announcing that the company had initiated the Clinical Trial. The press release announced that the primary objectives

of Phase I of the Clinical Trial were "to determine the safety, maximum tolerated dose (MTD), and the pharmacokinetics (PK) of HuMab-5B1."

### c. MabVax's Financial Future

44. Given that MabVax was a "clinical stage" company, the state of its finances was material to investors, including Plaintiffs. Defendants knew that MabVax's finances were material to investors, including Plaintiffs.

45. The amount of financing that an early-stage biotechnology company like MabVax had already secured is material to investors because early-stage biotechnology companies, like MabVax, often do not generate any revenue. Thus, companies like MabVax rely on financing to keep them operating until their products are either sold or licensed to other companies or reach the consumer market. Until either of those stages occurs in a biotechnology company's life, it relies on financing. If the company runs out of financing, it will likely cease to exist. Defendants, as experienced executives of a publicly traded early-stage biotechnology company, knew this.

46. Crucially, MabVax and Defendants already were representing to investors that the receipt of the second $5,000,000 tranche from Oxford was a sure thing. On or around September 3, 2016, MabVax and Defendants sent out a shareholder letter to the Plaintiffs, among other investors, signed by Hansen in California. Defendants also included a copy of this letter in MabVax's 8-K, filed with the SEC on September 7, 2016. This letter stated unequivocally that MabVax had obtained "***12 months' operating capital to complete Phase 1***". This was a plain and clear reference to the $5,000,000 second tranche from Oxford. The letter also stated that MabVax had in place "all the ingredients required for long-term success and value creation for our stock." Defendants were able to induce further investments, in part, because they falsely claimed to have

12 months of operating capital, thus portraying MabVax as financially healthier than it actually was.

47. On September 6, 2016, MabVax filed a presentation with the SEC. As was routinely the case, the presentation was given by Hansen and was attached to an 8-K signed by Hansen in California. Hansen's name was also on the front page of the presentation. In a slide titled "Financial Information and Market Statistics", set forth below, the presentation showed MabVax's "Cap Table". The Cap Table, in turn, stated that MabVax currently had $5,000,000 in debt from Oxford, but that was "Before Second Tranche".

(Deleted)

## Financial Information and Market Statistics

| Cap Table (In Mils.) | | |
|---|---|---|
| Before Financing | Pro Forma After Financing | Remarks - All Numbers Stated Post-Reverse Split |
| $ 3.0 | $ 11.4 | Cash and cash equivalents (as of June 30, 2016) |
| $ 1.0 | $ 1.0 | Monthly burn rate |
| $ 5.0 | $ 5.0 | Debt - Oxford Finance LLC Before Second Tranche* |
| 4,235,339 | 5,641,350 | Common stock outstanding |
| - | 324,727 | Most favored nations April 2015 PIPE financing |
| 2,165,190 | 2,165,190 | Common equivalents - Series D Preferred Stock** |
| 450,446 | 519,751 | Common equivalents - Series E Preferred Stock** |
| - | 665,281 | Common equivalents - Series F Preferred Stock** |
| 6,850,975 | 9,316,299 | Total common and common equivalents |
| 1,199,505 | 5,124,144 | Total warrant shares |
| $ 9.87 | $ 6.84 | Average warrant exercise price (expire from Oct. 2017-Jan. 2021) |

Principal Stockholders: OPKO/Dr. Phil Frost, others 4.99% voting blockers, RTP Venture Fund

**Market Statistics:**

| | | |
|---|---|---|
| Market Cap: | $ 28,714,472 | Based solely on common stock outstanding |
| Share Price: | $ 5.09 | Closing price on September 2, 2016 |
| Avg. Volume: | 18,690 | Volume on Nasdaq August 19, 2016 |
| Ticker Symbol: | MBVX | Nasdaq Capital Market |

* Issued Jan 15, 2016, 4-yr term, int. only 1st yr, straight amort. Of principal next 3 yrs
** Series D, E and F Preferred Stock include 4.99% voting blockers, no price resets or look back provisions or special dividends, $0.01 per share liquidation preference

 MabVax therapeutics

29

September 6, 2016 8-K, Ex. 99.1, Slide 29.

48. In an interview with "Stock News Now" on August 22, 2016, which was published on YouTube on September 6, 2016, Hansen (1) acknowledged the importance of MabVax's funding

through Phase 1; and (2) stated that MabVax "certainly [could] pull down" the $5,000,000 loan from Oxford, explaining as follows:

> We were able to finalize on 9.4 million dollars [in a recent equity raise], and so for us that's a substantial amount of money. If we combine that with our three million dollars that we had in our bank account at the end of the first quarter that's now 12, *plus we do have a debt financing arrangement in place with Oxford Finance and we certainly can pull down an additional five million dollars in debt financing here*, we hope in the next short period of time. *So that would certainly give us more than enough cash to reach our—what are considered to be our most important milestones—which are the end of the phase one clinical trials in the mid-term next year.* (emphasis added)

53.     The first part of the Clinical Trial (Phase 1a) was designed to determine a safe dosage level (the Maximum Tolerable Dose) for administration of the HuMab-5B1 (MVT-5873) antibody alone. To do this, the protocol for Phase 1a of the Clinical Trial called for cohorts of three patients each to be dosed at increasing levels of the antibody (1 mg/kg, then 2 mg/kg, then 3 mg/kg). Patients were monitored weekly for adverse events. If a patient encountered Dose Limiting Toxicity (such as elevated liver function), that patient's dose would be reduced, or treatment would be delayed or discontinued.

54.     The first two cohorts of three patients each (which MabVax identified, collectively, as cohort "A1") began treatment with the antibody at the dosage level of 1 mg/kg in February and March 2016.

55.     A next cohort of three patients (cohort "A2") began treatment with the antibody at the dosage level of 3 mg/kg in April and May 2016.

56.     Almost from the start, a disturbingly high number of these nine patients encountered adverse events caused by the treatment, including elevated liver function,

hyperglycemia, hypoalbuminemia, anemia, vomiting and nausea. The nine patients enrolled in cohorts A1 and A2 encountered forty-four recorded Adverse Events.[5]

57.    More ominously, on information and belief at least five of the initial nine patients encountered Adverse Events that were diagnosed as "Grade 3." Under the CTCAE criteria published by the US Department of Health and Human Services and utilized throughout the U.S. medical system, an Adverse Event is to be graded as "Grade 3" when it is "Severe or medically significant but not immediately life-threatening [or] hospitalization or prolongation of hospitalization indicated [or] disabling." An Adverse Event is to be graded as "Grade 4," when the Adverse Event presents "life-threatening consequences" indicating the need for "urgent intervention."

58.    Unsurprisingly, as the dosage of antibody administered to patients increased during 2016, so did the number of Adverse Events encountered by those patients. The six patients in Cohort "A5" who were administered antibody at the dosage of 2 mg/kg encountered twenty-five Adverse Events, with nine of those events graded as "Grade 3 – Severe." The five patients in Cohort "A7" who were administered antibody at the dosage of 2.5 mg/kg encountered forty-nine Adverse Events, with ten of those events graded as either "Grade 3 - Severe" or "Grade 4 – Life Threatening." And the six patients in Cohort "A6" who were administered antibody at the dosage of 3.0 mg/kg encountered thirty-one Adverse Events, with five of those events graded as "Grade 3 – Severe."

59.    Throughout 2016 and into 2017, neither of the Defendants nor MabVax made any disclosures to investors about the prevalence of Adverse Events, including Severe and Life-

---

[5] The adverse event data alleged in paragraphs 56-58, 60 and 63 was reported in documentation that MabVax sent to a potential strategic partner during 2017.

Threatening Adverse Events, and Dose Limiting Toxicities, that were being encountered by patients enrolled in the Clinical Trial. To the contrary, as detailed below, Defendants repeatedly made affirmative misstatements that the treatment was "safe" and "well tolerated" by patients.

60.     In all, the 32 patients who completed the initial dose-escalation/monotherapy portion of the Phase I trial, encountered 172 Adverse Events, with 31 of those events graded as Severe or Life-Threatening Adverse Events. In addition to Dose Limiting Toxicities, roughly half of the patients enrolled in Phase 1a encountered at least one Severe or Life-Threatening Adverse Event. Even among the patients who received the **lowest** antibody dosage of 1 mg/kg, twenty-five percent suffered a Severe Adverse Event. Defendants disclosed none of this data to investors, and instead affirmatively misrepresented that the treatment was "safe" and "well tolerated" by patients.

61.     Even more troubling was the number of patients with suspected Hy's Law cases. Hy's Law is a rule of thumb that a patient is at high risk of a fatal drug-induced liver injury from a medication if administration of that medication results in elevated enzymes and serum bilirubin above certain thresholds. These parameters are extensively monitored in clinical trials (and were monitored in the patients in MabVax's Clinical Trial) in an effort to prevent acute liver failure and death from liver failure.

62.     As stated in the FDA's Guidance on Drug Induced Liver Injury: ". . . finding one Hy's Law case is worrisome; finding two is considered highly predictive that the drug has the potential to cause severe liver injury when given to a larger population."[6] This FDA guidance pertains to large clinical trials involving hundreds to thousands of patients. The FDA Guidance

---

[6] *Guidance for Industry. Drug-Induced Liver Injury: Premarketing Clinical Evaluation*. US Food and Drug Administration (2009), at p. 5.
Available at:  https://www.fda.gov/media/116737/download

references a trial where two cases of Hy's Law in about 1,000 exposures prevented the drug from being approved.

63.     By comparison, in MabVax's Clinical Trial seven suspected cases of Hy's Law surfaced in just thirty-eight patients.

~~Also, On September 13, 2016 Hansen caused an 8-K to be filed which included an investor presentation titled, "Immuno-Oncology Products Discovered From the Human Immune Response to Cancer". Under the KEY HIGHLIGHTS section, Hansen stated the following material facts: (1) Uplist and interim data readout triggers $5M in additional debt financing from Oxford Finance, and (2) Pull down expected fourth quarter.~~

64.     Ultimately, in a June 5, 2017 press release MabVax stated that it had determined that the Maximum Tolerable Dose for its antibody was 1 mg/kg. "Maximum Tolerable Dose" is defined in medical literature as the highest dose of a drug or therapy that does not cause unacceptable side effects or toxicity.

65.     But many months before the Phase 1a dose-escalation portion of the Clinical Trial was completed, and before the Maximum Tolerable Dose was determined, Defendants caused MabVax to rush out a false and misleading press release on November 14, 2016, boasting of "Interim Safety and Imaging Results" from the Clinical Trial, described further below. In that same press release, Defendants caused MabVax to also announce that based on the results from the incomplete dose-escalation phase of the trial, MabVax had opened the Phase 1b "Combination Trial" portion of the trial, where its antibody would be administered in combination with standard of care chemotherapy (specifically, gemcitabine and nab-paclitaxel).

66.     The early safety results from the Combination Trial were disastrous. The first cohort of the Combination Trial enrolled three patients, who commenced treatment from mid-November to mid-December 2016. All three patients encountered a large number of Adverse Events; twenty-one in total, four of which were Grade 3 (severe) and one Grade 4 (life

threatening). The Severe Adverse Events principally involved elevated liver function. These patients' elevated liver function tests remained high for several weeks. Two of the three initial patients in the Combination Trial also passed the threshold for Hy's Law, indicating that they were at high risk of a fatal drug-induced liver injury.

67.     Numerous studies have shown that the incidence of Grade 3 or worse liver injury in patients treated with gemcitabine and nab-paclitaxel alone is less than 5%. By comparison, in the first cohort of patients who were administered gemcitabine and nab-paclitaxel in combination with MabVax's antibody, the incidence of Grade 3 liver injury **was 100%.**

68.     In short, the combination of MabVax's antibody with gemcitabine and nab-paclitaxel was highly toxic to the first three patients. They all were pulled out of the treatment within a matter of weeks, by February 7, 2017 at the latest.

69.     Based on the results of the first cohort in the Combination Trial, the doctors treating patients decided to reduce the dosage of antibody administered to the second cohort of the Combination Trial **by a factor of eight**. Specifically, dosage of MabVax's antibody was reduced from 1 mg/kg down to 0.125 mg/kg.

70.     Both Defendants knew in early 2017 about the poor early results of the Combination Trial, and the decision to massively reduce the dosage of antibody provided to subsequent patients due to the prevalence of Severe Adverse Events.

71.     The substantial reduction in antibody dose for patients in the Combination Trial started in early January 2017. But for nearly ten months, Defendants failed to disclose that material fact. The first mention of it was in a press release issued on October 31, 2017, discussed further below. But while noting the dosage, the press release omitted to mention that dosage had

been reduced from 1.0 to 0.125, and that the reason for the massive reduction was because of the severe liver toxicity encountered by the first three patients.

72.     The second cohort of three patients in the Phase 1b Combination Trial commenced treatment (at the much lower dosage level) on January 16, March 29 and May 8, 2017. The incidence of elevated liver function was reduced, but two of these three patients developed a condition called pneumonitis prior to June 2017, both at a "Grade 3 – Severe" level. Pneumonitis is inflammation of lung tissue that has the potential to cause irreversible lung damage. Treatment of all three patients in the second cohort of the Combination Trial was completed on or before June 7, 2017.

73.     So, of the first six patients who participated in the Combination Trial, the first three all encountered severe liver toxicity, requiring delay or discontinuation of their treatment. The next cohort was treated with a massively reduced dosage of the antibody; despite that precaution, two of the next three patients encountered Grade 3 pneumonitis. Most if not all of those Severe Adverse Events were encountered by May 2017. Defendants knew these facts.

74.     Despite knowing by May 2017 that five of the first six patients in the Phase 1b Combination Trial had encountered Grade 3 or 4 Adverse Events – an astounding eighty-three percent – the Defendants caused MabVax to issue over a half dozen false public statements (detailed below) variously announcing that treatment administered to the first six patients in the Combination Trial was "safe," results were "positive" and "promising," and the treatment was "generally well tolerated."  The fact that patients had to discontinue therapy and receive medical intervention means that treatment was not "safe" or "well tolerated." No more patients were enrolled in the Clinical Trial until some time in late 2017.

*d. Expiration of the Loan and Material Omissions by Defendants Regarding Oxford's*

*Rejection*

49. In early September 2016, Defendants had an in-person meeting with representatives of Oxford, during which Defendants relayed the current interim data to Oxford and asked that Oxford fund the second tranche. Oxford assessed that data, and on the basis of the data declined to fund the second tranche.

50. After September 6, 2016, and before the September 30, 2016, expiration date for the second tranche of the Oxford loan, the Company did not make any public statements regarding their request for the second $5,000,000 tranche from Oxford and Oxford's subsequent denial of such request. During this time, Plaintiffs were under the false belief, due to MabVax's and Defendants' misstatements and omissions, that MabVax would secure the second tranche of $5,000,000 from Oxford. Further, Plaintiffs had no idea that the Phase 1 results were negative, as MabVax and Defendants had only disclosed that material non-public information to Oxford.

51. The first new public statement made by the Company regarding Oxford was in a November 7, 2016 10-Q, almost *six weeks* after the expiration date. The Company's November 7, 2016 10-Q, signed by both Defendants, stated simply that:

> [t]he option to fund the second tranche of $5,000,000 . . . was upon the Company achieving positive interim data on the Phase 1 HuMab 5B1 antibody trial in pancreatic cancer and successfully uplisting to either the NASDAQ Stock Market or NYSE MKT on or before September 30, 2016. ***The option for the Term B Loan expired on September 30, 2016.*** The Company is not pursuing completion of any additional debt financing with Oxford Finance, LLC at the present time." In later filings, the Company stated only: "The option for the . . . Loan expired on September 30, 2016. (emphasis added)

52. What MabVax and Defendants materially omitted from this statement was that—as they well knew, since Defendants were the ones who had the communications with Oxford—they had already attempted to secure the second tranche of $5,000,000, and Oxford had denied their

request due to insufficient Phase 1 data. It was not until three years later, on or about December 30, 2019, that the Plaintiffs learned in a series of telephone conversations with a banker who worked on the transaction that Defendants *had indeed requested the second tranche for $5,000,000 and were denied by Oxford due to insufficient data before the expiration date*. Further, upon information and belief, Oxford received data from MabVax not available to the public, including Plaintiffs, and based on this data, still refused to provide the second tranche of $5,000,000.

53. MabVax and Defendants were fully aware of but intentionally omitted Oxford's rejection because they knew that any kind of "bad press" would be disastrous to MabVax's ability to raise future funding given its status as an early-stage biotechnology company. A sophisticated investor like Oxford rejecting the data on MabVax's "lead antibody development program" would be just that. Despite the positive reports in MabVax's public filings, Oxford clearly did not agree that there was "positive interim data" sufficient to provide the funding.

54. MabVax and Defendants knew that this information was material to investors. Moreover, MabVax's and Defendants' statement that the loan "expired" was clearly directed to, and did, mislead investors, including Plaintiffs, to believe that MabVax was not rejected. Plaintiffs, like other investors, were led to believe that Oxford did not reject MabVax. *This was not the case*. As Defendants well knew, but as the Plaintiffs learned only later, a request *was* made and *was* rejected. Plaintiffs had a right to know this material information, and Defendants and MabVax purposely withheld it.

55. After this point, and deprived of such knowledge by MabVax and Defendants, Plaintiffs were induced by MabVax and Defendants into investing significantly more in MabVax. Plaintiffs

would not have made any of the following additional investments had they known that MabVax requested funding from Oxford and was denied due to insufficient data:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| GRQ Consultants, Inc. Roth 401k FBO Barry Honig | $500,000 | 5/5/2017 |
| GRQ Consultants, Inc. Roth 401k FBO Renee Honig | $100,000 | 5/15/2017 |
| Robert S. Colman Trust UDT 3/13/85 | $49,999.25 | 5/16/2017 |
| HSCI | $500,000 | 5/19/2017 |
| GRQ Consultants, Inc. 401k | $300,000 | 8/16/2017 |
| HSCI | $350,000 | 8/16/2017 |
| HSCI | $400,000 | 9/12/2017 |
| HSCI | $600,000 | 9/25/2017 |
| GRQ Consultants, Inc. 401k | $500,000 | 10/11/2017 |
| GRQ Consultants, Inc. Roth 401k FBO Renee Honig | $1,150,000 | 2/1/2018 |
| Robert S. Colman Trust UDT 3/13/85 | $100,000.50 | 2/5/2018 |
| GRQ Consultants, Inc. Roth 401k FBO Barry Honig | $100,000 | 2/8/2018 |
| Robert S. Colman Trust UDT 3/13/85 | $40,000 | 5/2/2018 |
| GRQ Consultants, Inc. Roth 401k FBO Renee Honig | $300,000 | 5/8/2018 |

56. Plaintiffs' investments in May 2017 were made pursuant to a publicly filed S-1 with the SEC, which was signed by both Hansen and Hanson in California on May 12, 2017 (the "May 12, 2017 S-1").

57. The May 12, 2017 S-1 omitted material information that induced the Plaintiffs to invest. Regarding the Oxford Loan Agreement, Defendants caused MabVax's May 12, 2017 S-1 to state only the following:

> Effective in January 2016, we entered into a $10 million loan and security agreement with Oxford Finance LLC, or Oxford Finance, that is secured by a lien covering substantially all of our assets, excluding intellectual property. As of December 31, 2016, we had an outstanding principal balance of $5 million. ***The option to draw the second $5 million expired on September 30, 2016***.

May 12, 2017 S-1 at 7 (emphasis added).

58. This statement materially omitted that MabVax and Defendants had ***requested*** the second $5 million tranche from Oxford and Oxford ***rejected*** the request due to MabVax's

insufficient Phase 1 data.[5] Instead, as MabVax and Defendants must have known, this statement led Plaintiffs to believe that Oxford had not rejected Defendants' request and created that illusion that the Phase 1 data was positive.

59. Had MabVax and Defendants not materially omitted that information, Plaintiffs would not have invested.

60. Plaintiffs' investments in September and October 2017 were made pursuant to publicly filed prospectus supplements, which Defendants caused MabVax to file on September 13, 2017 (the "September 13, 2017 Prospectus Supplement") and October 11, 2017 (the "October 11, 2017 Prospectus Supplement"), and an S-3 signed by both Defendants which MabVax filed on July 14, 2017 (the "July 14, 2017 S-3") and which incorporated several publicly filed documents by reference.

61. The September 13, 2017 Prospectus Supplement omitted material information that caused the Plaintiffs to invest. Regarding the Oxford Loan Agreement, Defendants caused MabVax's September 13, 2017 Prospectus Supplement to state only the following:

Effective in January 2016, we entered into a $10 million loan and security agreement with Oxford Finance LLC, or Oxford Finance, that is secured by a lien

---

[5] Defendants caused MabVax to state the same information in several sections of the May 12, 2017 S-1: "**Oxford Loan**—On January 15, 2016, we entered into a loan and security agreement with Oxford Finance LLC (the 'Load [sic] and Security Agreement') providing for senior secured term loans to us in the aggregate principal amount of up to $10,000,000. On January 15, 2016, we received an initial loan of $5,000,000 under the Loan and Security Agreement. ***The option to draw the second $5,000,000 expired on September 30, 2016.***" (May 12, 2017 S-1 at 36) (emphasis added).

"On January 15, 2016, we entered into a loan and security agreement with Oxford Finance LLC pursuant to which we had the option to borrow $10,000,000 in two equal tranches of $5,000,000 each (the 'Loan Agreement'). The first tranche of $5,000,000 was funded at close on January 15, 2016 (the 'Term A Loan'). The option to fund the second tranche of $5,000,000 (the 'Term B Loan') was upon the Company achieving positive interim data on the Phase 1 HuMab-5B1 antibody trial in pancreatic cancer and successfully uplisting to either the NASDAQ Capital Market or NYSE MKT on or before September 30, 2016. ***The option for the Term B Loan expired on September 30, 2016.***" (May 12, 2017 S-1 at F-14) (emphasis added).

covering substantially all of our assets, excluding intellectual property. As of December 31, 2016, we had an outstanding principal balance of $5 million. ***The option to draw the second $5 million expired on September 30, 2016.***

September 13, 2017 Prospectus Supplement at S-6 (emphasis added).

62. This statement materially omitted that MabVax and Defendants had ***requested*** the second $5 million tranche from Oxford and were ***rejected*** due to MabVax's insufficient Phase 1 data. Instead, as MabVax and Defendants must have known, this statement led Plaintiffs to believe that Defendants had not been rejected and that the Phase 1 data was positive.

63. Had MabVax and Defendants not materially omitted that information, Plaintiffs would not have invested.

64. Similarly, the October 11, 2017 Prospectus Supplement omitted material information that caused the Plaintiffs to invest. Regarding the Oxford Loan Agreement, Defendants caused MabVax's October 11, 2017 Prospectus Supplement to state only the following:

Effective in January 2016, we entered into a $10 million loan and security agreement with Oxford Finance LLC, or Oxford Finance, that is secured by a lien covering substantially all of our assets, excluding intellectual property. As of December 31, 2016, we had an outstanding principal balance of $5 million. ***The option to draw the second $5 million expired on September 30, 2016.***

October 11, 2017 Prospectus Supplement at S-6 (emphasis added).

65. This statement also materially omitted that MabVax and Defendants had ***requested*** $5 million from Oxford and were ***rejected*** due to MabVax's insufficient Phase 1 data. Instead, as MabVax and Defendants must have known, this statement led Plaintiffs to believe that Oxford had not rejected MabVax's request.

66. Had MabVax and Defendants not materially omitted that information, Plaintiffs would not have invested.

67. The July 14, 2017 S-3, which was signed by both Hansen and Hanson in California, states explicitly that MabVax "filed with the Securities and Exchange Commission, and

incorporate by reference" several filings, including MabVax's Annual Report on Form 10-K for the fiscal year ended December 31, 2016, which was filed on March 1, 2017. That 10-K, which was signed by both Defendants, states, regarding the Oxford Loan Agreement, that:

> [e]ffective in January 2016, we entered into a $10 million loan and security agreement with Oxford Finance LLC, or Oxford Finance, that is secured by a lien covering substantially all of our assets, excluding intellectual property. As of December 31, 2016, we had an outstanding principal balance of $5 million. ***The option to draw the second $5,000,000 expired on September 30, 2016.***

March 1, 2017 10-K at 11 (emphasis added).

68. This statement, just like the others, materially omitted that MabVax and Defendants had ***requested*** $5 million from Oxford and were ***rejected*** due to MabVax's insufficient Phase 1 data. Instead, as MabVax and Defendants must have known, this statement led Plaintiffs to believe that Oxford had not rejected Defendants' request.

69. Had MabVax and Defendants not materially omitted that information, Plaintiffs would not have invested.

70. Further, MabVax's material omission that Oxford had rejected its request for $5 million is directly and causally related to MabVax's bankruptcy and Plaintiffs' loss. The fact that the Phase 1 results were not sufficient to secure the second phase of the Oxford loan demonstrates that MabVax was nowhere near creating a viable product and would be unable to attract further investments, which was critical for MabVax's very survival. MabVax and Defendants materially omitted this information, which ultimately led to its bankruptcy. Had MabVax and Defendants not omitted this highly material information from Plaintiffs, they never would have invested in MabVax. MabVax's and Defendants' omission that their second loan request had been rejected by Oxford pertained to the very risk that was concealed by this omission. In other words, Defendants' omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

75. ~~71.~~ MabVax's situation in 2017 and 2018 was financially precarious. If MabVax had not obtained outside funding from Plaintiffs, the company would have collapsed and Defendants likely would have lost their jobs.

76. ~~72.~~ In 2017, while MabVax's ability to continue as a going concern was in question from month-to-month, Defendants used shareholders' money, including Plaintiffs', to cause MabVax to compensate them over ***$3 million*** in salary, bonus, equity, and other compensation. MabVax would not have had the funds to pay Defendants this exorbitant compensation had it and Defendants not withheld material information in order to induce Plaintiffs to make investments during 2017:

| 2017 EXECUTIVE COMPENSATION | | | | | |
|---|---|---|---|---|---|
| Name | Salary | Stock | Options | Other Comp | Total |
| J. David Hansen | $427,876 | $448,500 | $1,252,905 | $36,634 | **$2,165,915** |
| Gregory P. Hanson | $309,312 | $277,016 | $224,945 | $36,928 | **$848,201** |

~~**II. Defendants' Lies and Tortious Interference with Contract Related to Management**~~

~~*a. April 2007*~~

~~73. In April of 2017, Plaintiffs were considering investing further into MabVax. Defendants' employment agreements were set to terminate on July 1, 2017. With that deadline in mind, in a phone call with Honig and Stetson on April 27, 2017, MabVax and the Defendants privately promised that the Defendants would take pay cuts in renewed employment agreements. As Defendants knew, Mr. Colman was aware of this promise.  In an email on April 27, 2017, Hansen laid out the 2017 budget, stating where they could eliminate other costs and defer payments.~~

77. According to sworn testimony by defendant Hansen, in "early 2018" a third participant in the Clinical Trial developed pneumonitis. MabVax's former Vice President of Pharmaceutical Development, Paul Maffuid, has testified under oath that this third incidence of pneumonitis was sufficiently "serious" in nature, that MabVax had to notify the FDA, and

MabVax was forced to revise the enrollment bulletin sent to doctors who were considering enrolling patients in the Clinical Trial. But neither Defendants nor MabVax disclosed those facts to Plaintiffs or other investors.

78.     Subsequently, a fourth participant in the Clinical Trial developed pneumonitis. As a result of four patients developing Severe pneumonitis, MabVax decided to completely **shut down** the Clinical Trial, stop any ongoing treatment of patients, and cease enrolling patients in the Clinical Trial.

79.     Defendants did not disclose the cessation of the Clinical Trial until October 15, 2018. Discovery will pinpoint precisely when the decision was made to shut down the trial. On information and belief, cases of pneumonitis began to surface in late 2016 and early 2017, Defendants each knew about, but omitted to disclose anything about those cases for at least a year, omitted to state that the Clinical Trial was suspended months before any disclosure was made, all while they repeatedly and falsely represented that the treatment was "safe" and "well tolerated" by patients.

### *d.*     **Defendants' Materially False and Misleading Statements and Omissions from November 14, 2016 through May 5, 2017.**

80.     At all relevant times Defendants were the two most senior executives at MabVax. The two Defendants controlled, and shared the final authority over, the public statements and disclosures put out by MabVax. There was no one above Defendants to overrule or alter their decisions on what press releases, SEC filings, or other disclosures MabVax released (or did not release), and when MabVax did so (or did not do so). It was Defendants who decided what MabVax would say publicly, how it would say it, and when it would say it (or not say it). They decided on the contents of the press releases and SEC filings (all of which filings were signed by

Defendant Hansen and many of which were signed by Defendant Hanson). Both Defendants each reviewed and approved all press releases and all SEC filings, without exception. The Defendants, and the Defendants alone, decided when to issue those press releases and when to make those SEC filings. Defendant Hanson even personally uploaded the Company's SEC filings for public dissemination when it was not lawyers doing so on the direct instructions of Hansen and Hanson.

81.   Defendants caused MabVax to issue misleading press releases concerning the progress of the company's Clinical Trial. As explained previously, the HuMab-5B1 antibody was MabVax's key asset, on which the Company's prospects heavily relied. Failure of the Clinical Trial was likely to impair Defendants' ability to raise capital to continue funding MabVax and their excessive personal compensation.

82.   On November 14, 2016, Defendants in California caused MabVax to issue a press release from its headquarters in California, which press release was simultaneously filed as an exhibit to a Form 8-K with the SEC, purporting to report "Interim Safety Results" from the Clinical Trial. The press release was headlined with a statement that "Sufficient safety established to initiate the evaluation of MVT-5873 as a front-line therapy in combination with a standard of care chemotherapy." The press release further stated:

> The MVT-5873 phase I clinical trial initiated in February 2016 is designed to establish safety and determine the recommended phase II dose (RP2D) for MVT-5873 as both as monotherapy (Part 1 of the trial), and in combination with standard of care chemotherapy (Part 2) using nab-paclitaxel plus gemcitabine. Initiation of Part 2 requires establishing three safe dose levels for MVT-5873 as monotherapy in patients with relapsed or refractory locally advanced or metastatic pancreatic cancer. *The Company reports that the safety of MVT-5873 has been established at three incremental dose levels by treating 16 patients at three clinical sites.* While patients continue to be recruited to establish the RP2D, the Company also reports that Part 2 of the clinical trial is now open and will include patients with previously untreated pancreatic cancer receiving a standard of care chemotherapy as defined in the protocol.

(emphasis added). Defendant Hansen was quoted in the press release, stating "[w]e are highly encouraged by these promising early results . . . ."

83.     The November 14, 2016 and Form 8-K filed on the same day were materially false and misleading. While it was correct that as of November 14, 2016, MabVax had dosed patients at three incremental dose levels – 1 mg/kg, 2 mg/kg, and 3 mg/kg – it was not true that "safety" had been established at each of those dosage levels. Further, although MabVax had "open[ed]" Phase 1b of the Clinical Trial, the stated precondition for that event (establishment of three safe dose levels) had not been achieved, contrary to the implication of that press release. As of that date, dosage at the levels of 2 mg/kg, and 3 mg/kg had caused patients to encounter a large number of Severe Adverse Events.  Even at 1 mg/kg, numerous adverse events had been noted, including several Grade 3 (Severe) Adverse Events.

84.     Defendants and MabVax later stated on June 5, 2017 that 1 mg/kg was the "Maximum Tolerable Dose" of its HuMab-5B1 (MVT-5873) antibody. Even assuming that 1 mg/kg, in the Phase 1a (monotherapy) trial, could be characterized as "safe" (which is far from clear), the higher dosages certainly could not be so described. Any dose higher than 1 mg/kg was unsafe. Given the number of Severe Adverse Events that had already been associated with higher doses by the time of the November 14, 2016 press release, "Safety" had not by any means "been established."

85.     On December 7, 2016, Defendants, in California, caused MabVax, from California, to file with the SEC a Current Report on Form 8-K, which attached an updated MabVax corporate slide deck that had been provided to some investors. The presentation contained a slide which represented that a "positive" milestone had been achieved in the HuMab-5B1 (MVT-5873) Clinical Trial; specifically, "Early safety established at interim milestone

readout in November" and "Early safety and tolerability established in 16 patients treated in three escalating dose cohorts."

86.     The December 7, 2016 Form 8-K filing was materially false and misleading, because MabVax had not achieved safety and tolerability of its HuMab-5B1 (MVT-5873) antibody "in three escalating dose cohorts," for the same reasons noted in paragraphs 82 and 83, above.

87.     On February 13, 2017, Defendants, in California, caused MabVax, from California, to file with the SEC a Current Report on Form 8-K, which attached an updated MabVax corporate slide deck that had been presented at the BIO CEO 2017 Investor Conference. The presentation contained a slide containing the following statements:

(Add)   ♦ **MVT-5873 Summary and Opportunity**
   – Efficacy signals from initial monotherapy phase I trial in stage 3 and 4 pancreatic patients very encouraging
   – Dosage levels required to achieve stable disease are modest (1 to 3 mg/kg)
   – Most dosage levels tolerated reasonably well with most AEs transient elevations in LFTs.

88.     The statement in the February 13, 2017 8-K that "Dosage levels required to achieve stable disease are modest (1 to 3 mg/kg)," was materially false and misleading because it omitted to state that dosage levels above 1 mg/kg were unsafe and exceeded the Maximum Tolerable Dose for the HuMab-5B1 (MVT-5873) antibody. The statement "most dosage levels tolerated reasonably well" was materially false and misleading because any dosage levels of the HuMab-5B1 (MVT-5873) antibody above 1 mg/kg were not tolerated "reasonably well," but rather caused patients to suffer dozens of Severe or Life-Threatening Adverse Events, as noted in paragraphs 82 and 83, above.

89.     On March 1, 2017, Defendants, in California, caused MabVax to file, from California, an Annual Report on Form 10-K for the fiscal year ended December 31, 2016. That

Form 10-K was signed by both Defendants Hansen and Hanson in California. Both Defendants Hansen and Hanson signed and filed with the SEC separate certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 attesting that they each had (a) reviewed MabVax's Annual Report on Form 10-K, and (b) based on their respective knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

90.     The 10-K filing stated in part that "the safety of MVT-5873 had been established at three incremental dose levels by treating 16 patients at three clinical sites." This statement was materially false and misleading, because MabVax had not achieved safety of its HuMab-5B1 (MVT-5873) antibody "at three escalating dose levels," for the reasons set forth in paragraphs 82 and 83, above.

91.     On March 31, 2017, Defendants in California, caused MabVax from California, to file with the SEC a Current Report on Form 8-K, which attached an updated MabVax corporate slide deck. The presentation contained a slide again containing the following statements: "Dosage levels required to achieve stable disease are modest (1 to 3 mg/kg);" and, "most dosage levels tolerated reasonably well with most [Adverse Events] transient elevations in [Liver Function Tests]."

92.     The slide presentation statement "most dosage levels tolerated reasonably well" was materially false and misleading because any dosage levels of the HuMab-5B1 (MVT-5873) antibody above 1 mg/kg was not tolerated "reasonably well," but rather caused patients to suffer dozens of Severe Adverse Events causing dose-limiting toxicities and requiring patients delay or reduce dosing or discontinue treatment. Further, the statement that "Dosage levels required to

achieve stable disease are modest (1 to 3 mg/kg)," was materially false and misleading because it omitted to state that dosage levels above 1 mg/kg were unsafe and exceeded the Maximum Tolerable Dose for the HuMab-5B1 (MVT-5873) antibody. Defendants and MabVax later stated in a June 5, 2017 press release that 1 mg/kg was the Maximum Tolerable Dose of its HuMab-5B1 (MVT-5873) antibody. Even assuming that 1 mg/kg in the Phase 1a (monotherapy) trial could be characterized as "safe" (which is far from clear), the higher dosages certainly could not be so described. Dosage above 1 mg/kg was unsafe. Additionally, the statement "most [Adverse Events] [were] transient elevations in [Liver Function Tests]" was false or misleading. On information and belief, the majority of patients' elevated Liver Function Tests were not "transient." While some patients' Liver Function Tests declined fairly quickly, many patients continued to have elevated results for several weeks to months.

93.    On May 5, 2017, Defendants, in California, caused MabVax from California to file with the SEC an Amended Registration Statement on Form S-1/A in connection with an offering of MabVax Series G Convertible Preferred Stock. That Form S-1/A was signed by Defendants Hansen and Hanson in California. The Prospectus Summary section of the Form S-1/A reported on the status of MabVax's Clinical Trial, stating the following (emphasis added):

> "[T]he safety of our HuMab-5B1 antibody designated as MVT-5873 had been established at three incremental dose levels in our phase I clinical trial . . . Patients continue to **tolerate the study drug reasonably well** with drug infusion reactions being the most common adverse event which is adequately addressed by slowing the infusion rate and use of routine premedication. Increases in liver function tests are seen early in a **minority** of patients and appear reversible."

94.    These statements were materially false and misleading, because as of the date of the statements MabVax had not achieved safety of its HuMab-5B1 (MVT-5873) antibody "at three incremental dose levels," and the treatment was not "reasonably well" tolerated. As of this date, MabVax actually had dosed patients at four incremental dose levels -- 1kg/mg, 2 mg/kg,

2.5 mg/kg and 3 mg/kg; doses at the latter three levels had caused patients to encounter a large number of Severe or Life-Threatening Adverse Events.  Given the number of Severe Adverse Events that had already been associated with higher doses by the time of this May 7, 2017 statement, "safety" had not by any means "been established at three incremental dose levels."

95.     The further statement that increases in liver function tests were seen in a "minority" of patients was materially false; a large majority of patients in the Clinical Trial, 80% or higher, had suffered increases in liver function tests.

96.     During early 2017, Defendants solicited Plaintiffs to purchase MabVax securities. Based upon the representations detailed above, Defendants fraudulently induced Plaintiffs to believe that MabVax's Clinical Trial was going well, that interim results were only positive, and that patients were tolerating the treatment well. Plaintiffs believed, as was represented to them, that their investments would be used to fund the Clinical Trial. Instead, the investments were used to fund Defendants' compensation.

97.     As of the beginning of May 2017, Defendants knew that patients in the Phase 1a "Monotherapy" portion of the Clinical Trial had encountered a disturbingly large number of Severe Adverse Events, principally liver toxicity. At the same time, Defendants also knew that the initial results from the Phase 1b "Combination Therapy" portion of the Clinical Trial were even worse, with severe liver toxicity that persisted as well as pneumonitis at the Grade 3 – Severe level.

98.     Plaintiffs' investments in May 2017 were made pursuant to MabVax's publicly filed S-1 with the SEC, which was signed by both Hansen and Hanson in California on May 5, 2017. The May 12, 2017 S-1 omitted material information that induced the Plaintiffs to invest.

99. 74. In reliance on that promise upon Defendants' false and misleading statements identified above, Plaintiffs made the following investments in May of 2017.MabVax:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| GRQ Consultants, Inc. Roth 401k FBO Barry Honig | $500,000 | 5/5/2017 |
| GRQ Consultants, Inc. Roth 401k FBO Renee Honig | $100,000 | 5/15/2017 |
| Robert S. Colman Trust UDT 3/13/85 | $49,999.25 | 5/16/2017 |
| HSCI | $500,000 | 5/19/2017 |

75. Defendants breached their promises, and caused MabVax to breach its promise, to Plaintiffs because they knew at the time that they made this promise that they would not be taking any pay cuts.

76. Just two months later, on July 3, 2017, the Defendants had MabVax announce in an 8-K, signed by Hansen in California, that they extended their lavish employment agreements on nearly identical terms to their previous employment agreements:

[o]n July 1, 2017, MabVax Therapeutics Holdings, Inc. ('Company') entered into renewed employment agreements with each of J. David Hansen, its Chairman, President and Chief Executive Officer, Paul W. Maffuid, Ph.D., its Executive Vice President of Research and Development, and Gregory P. Hanson, CMA, MBA, its Chief Financial Officer (the 'Employment Agreements'). The principal purpose of each of the Employment Agreements was to extend the term of each of Mr. Hansen's, Dr. Maffuid's and Mr. Hanson's (the 'Executives') employment through July 1, 2020 as previously entered into employment agreements terminated or will terminate on July 1, 2017, July 21, 2017 and July 1, 2017, respectively. These agreements supersede and replace the Employment Agreements between the Company and each of Mr. Hansen and Mr. Hanson dated July 1, 2014 and the Employment Agreement between the Company and Dr. Maffuid dated July 21, 2014 (the 'Prior Agreements') and contain substantially the same terms as the Prior Agreements except as set forth below.

July 3, 2017 8-K at 2.

77. There were no material pay cuts:  According to the July 3, 2017 8-K, Hansen's base salary was set at $430,000, with bonus eligibility "[u]p to 50% of Base Salary", and Hanson's base salary was set at $310,000, with bonus eligibility "[u]p to 50% of Base Salary". According to an April 2, 2018 10-K, Hansen's base salary in 2016 was $418,438, and Hanson's base salary was

$276,014. The April 2, 2018 10-K further shows that Defendants received these full amounts. Hansen's base salary for fiscal year 2017 was $427,876. Hanson's base salary for fiscal year 2017 was $309,312. *See* April 2, 2018 10-K at 52.

78. On July 3, 2017, Stetson emailed Hansen: "I was surprised to see this filing. It was my understanding that there were going to be pay cuts until the company was fully funded." Hansen responded the next day, cc'ing Hanson, and did not deny that those cuts were discussed. Instead, Hansen stated:

Management agreements expired July 1. If either the employee or the company did not renew, then the whole management team is terminated and severance compensation kicks in. Management is meeting weekly with the board to discuss all expense forecasts and capital raising efforts. The board is monitoring all compensation and related expenses closely.

79. Because Stetson was told that management was still discussing expenses and the board was monitoring compensation, it was unclear whether  and at what point the pay cuts would happen.

*b. August 2017*

100.    Had Defendants not misrepresented and omitted material information, Plaintiffs would not have made those investments.

e.    **Defendants' Materially False and Misleading Statements and Omissions from May 5, 2017 through October 11, 2017.**

101.    On May 22, 2017, Defendants, in California, caused MabVax, from California, to file a Quarterly Report on Form 10-Q for the quarter ended March 31, 2017 (the "Q1 2017 Form 10-Q"). That Form 10-Q was signed by both Defendants Hansen and Hanson in California. Both Defendants Hansen and Hanson signed and filed with the SEC separate certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 attesting that they each had (a) reviewed the report, and (b) based on their respective knowledge, the report did not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

102.    In reporting on the progress of the HuMab-5B1 (MVT-5873) Clinical Trial, MabVax's Q1 2017 Form 10-Q reported in part that:

> "**the safety of our HuMab-5B1 antibody designated as MVT-5873 had been established at three incremental dose levels** in our phase I clinical trial. . . . After establishing the current dosage safety level for MVT-5873 in Part 1 of the trial, we were able to initiate part 2 of our phase I study. Part 2 combines MVT-5873 with a standard of care chemotherapy regimen in newly diagnosed treatment naïve patients. . .
> As of April 2017, we had enrolled 29 patients in Part 1 of our phase I trial at three clinical sites. Twenty-five patients are currently evaluable. . . Patients continue to **tolerate the study drug reasonably well** with drug infusion reactions being the most common adverse event, which is adequately addressed by slowing the infusion rate and use of routine premedication. **Increases in liver function tests are seen early in a minority of patients and appear reversible**. (emphasis added)
> 80. Later, in an August 8, 2017 Letter Agreement between MabVax and HSCI, HSCI

"consent[ed] to and agree[d] that the Company may sell and investors shall purchase an aggregate of up to $2,350,000 securities of the Company in a registered direct offering."

81. The deal, at the request of investors, including Plaintiffs, included a provision whereby the employment terms of all management would be reduced from three years to two years. Moreover, management would defer material portions of their salaries for the remainder of the year. In Section E, the August 8, 2017 Letter Agreement stated:

> The employment terms of all management shall be reduced to two years from three years. Management shall defer portions of their salary for the remainder of the year, which shall be paid upon the earlier of completion of the $8,000,000 Financing or a business transaction that represents, or transactions in the aggregate that represent, in excess of $10,000,000.

103.    These statements in MabVax's Q1 2017 Form 10-Q were materially false and misleading. As of the date of the filing, MabVax had not achieved safety of its HuMab-5B1 (MVT-5873) antibody "at three incremental dose levels," the treatment was not tolerated

"reasonably well," and it was untrue that increases in lever function tests were seen only in a "minority of patients," for the reasons set forth in paragraphs 93 and 94, above.

104.    MabVax's Q1 2017 Form 10-Q was further materially false and misleading in that it omitted to state that by this time at least five of six patients in the Phase 1b/Combination Trial suffered Severe Adverse Events, including liver toxicity and two cases of pneumonitis. The Q1 2017 Form 10-Q was further false and misleading in stating that "after establishing the **current dosage safety level for MVT-5873 in Part 1 of the trial, we were able to initiate part 2 of our phase I study**," (emphasis added), while omitting to mention that due to the high rate of adverse events suffered from the first cohort of patients enrolled in "part 2 of our phase I study," the dosage level for subsequent patients had to be reduced **eight-fold**, from 1 mg/kg to 0.125 mg/kg.

105.    During May-August 2017, Defendants knew that patients in the Phase 1a "Monotherapy" portion of the Clinical Trial had encountered a disturbingly large number of Severe or Life Threatening Adverse Events, principally liver toxicity. Defendants also knew that the initial results from the Phase 1b "Combination Therapy" portion of the Clinical Trial were even worse. At least five of the first six patients in the Phase 1b Combination Trial (83%) had encountered Grade 3 or 4 Adverse Events, a remarkably high number.

106.    Despite that knowledge, during May-August 2017, Defendants solicited Plaintiffs to purchase additional MabVax securities. Based upon the misrepresentations detailed above, Defendants fraudulently induced Plaintiffs to believe that MabVax's Clinical Trial was going well, that interim results were only positive, and that trial patients were tolerating the treatment well.

107.    In August 2017, MabVax was again running out of cash to operate its business, and the Clinical Trial was not going well. MabVax only had enough money to last until late

September or early October 2017. Just as bad, due to the Company's dim prospects, its entire clinical operations department had quit, three of the Company's five executives had given notice that they were quitting, certain vendors were refusing to provide further services until their accounts were brought current, and the Company had no money to enroll additional patients in the Clinical Trial.

108.    At a MabVax Board of Directors meeting on or about August 27, 2017, Defendant Hansen presented a plan to wind down the Company. The broad outline of the plan was for the Company to cut expenses to the bone, retain an investment banker to market all of MabVax's assets for potential sale, and then with the expectation that all assets would be sold by the end of 2017, to then sell off or reverse merge MabVax's corporate shell.

109.    On September 6, 2017, MabVax announced that it had engaged Greenhill & Co., an independent investment bank, to serve as a financial advisor to assist MabVax in exploring and evaluating strategic options with the goal of maximizing shareholder value. The release quoted Defendant Hansen stating, "As part of our ongoing evaluation and prioritization of our portfolio of assets, and in response to inbound inquiries, we have engaged an industry-leading firm to advise us on potential alternatives and strategies that will have the potential to unlock shareholder value." The press release was materially misleading by omitting to state that Hansen had previously disclosed to MabVax's Board the disappointing Clinical Trial results, and that Hansen had presented the Board a plan to divest MabVax of all of its assets and leave it as an empty corporate shell by the end of 2017.

110.    In reliance upon Defendants' misrepresentations and omissions, Plaintiffs made further investments in MabVax during September and October 2017 pursuant to (i) an S-3 signed by both Defendants in California which MabVax filed, from California, on July 14, 2017 (the

"July 14, 2017 S-3"), and (ii) publicly filed prospectus supplements, which Defendants, in California, caused MabVax to file from California on September 13, 2017 (the "September 13, 2017 Prospectus Supplement") and October 11, 2017 (the "October 11, 2017 Prospectus Supplement"). The S-3 and prospectus supplements incorporated certain publicly filed documents by reference.[7]

111.    The July 14, 2017 S-3, September 13, 2017 Prospectus Supplement and October 11, 2017 Prospectus Supplement omitted material information that caused the Plaintiffs to invest. Had MabVax and Defendants not materially omitted that information, Plaintiffs would not have invested.

112.    82. In August of 2017, based on that Letter Agreement and reliance upon Defendants' promises to reduce their employment terms and defer material portions of their salaries false and misleading statements identified above, Plaintiffs made the following additional investments in MabVax:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| GRQ Consultants, Inc. 401k | $300,000 | 8/16/2017 |
| HSCI | $350,000 | 8/16/2017 |
| HSCI | $400,000 | 9/12/2017 |
| HSCI | $600,000 | 9/25/2017 |
| GRQ Consultants, Inc. 401k | $500,000 | 10/11/2017 |

83. Even though MabVax received the funding, upon information and belief, Defendants again forced MabVax to breach those promises — Defendants never reduced their management term length or deferred portions of their salaries. According to the April 2, 2018 10-K, Defendants' salaries were nearly identical to those presented in the July 3, 2017 8-K. In the July 3, 2017 8-K

---

[7] All three filings expressly incorporated by reference MabVax's 2016 Annual Report on Form 10-K and Q1 2017 Form 10-Q, including the false statements contained in those documents (*see* ¶¶ 88-89, 101-103, *supra*).

Hansen's base salary was set at $430,000. According to the April 2, 2018 10-K, he received $427,876 in fiscal year 2017, with $448,5000 RSUs, $1,252,905 options, and $36,634 of "Other Compensation". In the July 3, 2017 8-K, Hanson's base salary was set at $310,000. According to the April 2, 2018 10-K, Hanson received $309,312, with $277,016 RSUs, $224,945 options and $36,928 in "Other Compensation". There was no material deferral of salaries.

84. Defendants, with full control of MabVax, forced MabVax to breach the terms of the August 8, 2017 Letter Agreement as part of their scheme to continue extracting as much compensation and other benefits as possible from their roles as executives of MabVax.

**III. _Defendant's Misrepresentations and Omissions Concerning Progress of MabVax's Phase 1 HuMab-5B Antibody Trials_**

85. Defendants caused MabVax to issue misleading press releases concerning the progress of the company's Phase 1 HuMab-5B Antibody trials. As explained previously, the HuMab-5B antibody was MabVax's key asset, on which the Company's prospects heavily relied. Failure of the Phase 1 HuMab-5B Antibody trials was likely to impair Hansen's ability to raise capital to continue funding MabVax and his excessive personal compensation.

86. MabVax's situation throughout 2018 was financially precarious. MabVax needed outside funding to stave off collapse; otherwise, Defendants likely would have lost their jobs.

87. Upon information and belief, on or about February 12, 2018, MabVax suspended patient enrollment in its Phase 1 HuMab-5B Antibody trials due to an "adverse event" involving a trial participant. Hanson and Hansen were both personally informed by other MabVax employees and/or the clinical personnel conducting and overseeing the trials that patient enrollment in the trial was being suspended. But MabVax and Defendants did not timely disclose that MabVax had suspended enrollment in its Phase 1 trials or the "adverse event."

88. In fact, MabVax's and Defendants' first public acknowledgment that anything was wrong with their Phase 1 trials appeared in MabVax's Form 10-Q for the first quarter of 2018, which was signed by both Defendants and which was filed extremely late—not until ***October 15, 2018***. There, MabVax and Defendants acknowledged the following:

On February 12, 2018, we reported on interim results of the current cohort of the Phase 1 study, in which MVT-5873 was given in combination with nab-paclitaxel and gemcitabine to patients newly diagnosed with CA19-9 positive pancreatic cancer. MVT-5873 at a dose of 0.125 mg/kg when added to first-line chemotherapy was generally well tolerated by all subjects. At that time, all six patients in the current cohort demonstrated measurable tumor reductions, with four patients meeting the criteria for partial response (PR) and two patients meeting the criteria for stable disease (SD). We believe these results further confirm results reported on a portion of the cohort in late 2017. Patient CA19-9 levels, which are a prognostic indicator of the disease state, were markedly reduced in all subjects with this combination therapy. ***Due to adverse events potentially related to the combination of nab-paclitaxel, gemcitabine and MVT-5873, not seen in the monotherapy clinical study, the Company has suspended patient enrollment at the current dose.*** We are evaluating plans to enroll additional patients at a lower dose to further explore safety and response in a larger population. (emphasis added)

Had Defendants not misrepresented and omitted material information, Plaintiffs would not have made those investments.

### f. *Defendants' Materially False and Misleading Statements and Omissions from October 12, 2017 through May 8, 2018.*

113.    On October 31, 2017, Defendants, in California, caused MabVax to issue a press release from California providing an "Update on the MVT-5873 Phase 1 Clinical Program." The press release described the status of the Phase 1b Combination Trial as follows:

MVT-5873 in combination with nab-paclitaxel and gemcitabine as first line therapy – The Company reported that newly diagnosed pancreatic cancer patients participating in the Phase 1 clinical trial of MVT-5873, when given in combination with first line nabpaclitaxel and gemcitabine, demonstrated reductions in tumor size after the first two months of therapy. The data reported from this dose escalation safety study included safety data from 7 patients at 1 mg/kg and 0.125 mg/kg. After the first cohort was treated at 1 mg/kg, the MVT-5873 dose was reduced to 0.125 mg/kg in combination with nab-paclitaxel and gemcitabine as the lower dose appears to be generally well tolerated.

114.     Plaintiffs are informed and believe that this release was the first time that MabVax or Defendants disclosed to investors that the dosage level for patients in the Phase 1b Combination Trial was lowered from 1.0 mg/kg to 0.125 mg/kg, despite the fact that the change to a lower dosage had occurred starting ten months earlier, in January 2017.

115.     The October 31, 2017, press release was materially false and misleading. First, the press release was false and misleading in affirmatively stating that the reduced dose of 0.125 mg/kg was "generally well tolerated," when two of the three patients who had received that reduced dose as of the date of the press release had suffered from Grade 3 (Severe) pneumonitis. Pneumonitis eventually caused MabVax to shut down the trial entirely when the condition surfaced in additional patients. Additionally, the press release was misleading in that it omitted to state that the dosage of antibody administered to patients in the Phase 1b Combination Trial had to be lowered from 1 mg/kg to 0.125 mg/kg, specifically because of the large number of persistent Severe Adverse Events suffered by the first cohort of three patients.

89. Despite the suspension of enrollment in their Phase 1 trials, purportedly in February 2018, Defendants continued to paint a misleadingly rosy picture of the progress of the trials in press releases upon which Defendants knew that investors (including Plaintiffs) would rely. Defendants knew that the picture they were painting was in conflict with the reality.

116.     90. For example, onOn February 6, 2018, MabVax and Defendants issued, in California, caused MabVax, from California, to file with the SEC a Current Report on Form 8-K, which attached a press release announcing a private placement securities offering. This press release quoted Defendant Hansen as stating, "Our clinical trial of MVT-5873 [HuMab-5B1] in combination with chemotherapy has continued to yield encouraging results. . . . Therefore, we intend to allocate a portion of the funds raised to continue patient enrollment at the current

treatment level to continue to confirm results seen to date." ~~MabVax and Defendants omitted from this press release the material information, which they well knew, that due to an "adverse event", enrollment in these clinical trials had been suspended.~~

117.     These statements were materially false and misleading, because there was nothing "encouraging" about the safety results from the Combination Trial. Hansen knew that five of the first six patients in the Combination Trial had encountered at least one Grade 3 (Severe) or Grade 4 (Life Threatening) Adverse Event, necessitating cessation of treatment, by early June 2017. Hansen also knew that the dosage of antibody administered to patients in the Combination Trial had to be lowered by a factor of eight, from 1 mg/kg to 0.125 mg/kg, specifically because of the large number of persistent Adverse Events suffered by the first cohort of three patients. Another fact known to Hansen was that even after reduction of dose, two of the first three patients who received the reduced dose of 0.125 mg/kg suffered from Grade 3 pneumonitis, the specific condition that caused MabVax to suspend the trial when the condition surfaced in additional patients.

118.     On information and belief, in late 2017 MabVax enrolled an additional cohort of three patients into the Combination Trial, bringing the total number of patients in the Combination Trial to nine. On further information and belief, these additional three patients received doses of antibody at the level of 0.125 mg/kg, bringing the  number of patients in the Combination Trial who had received doses at the 0.125 mg/kg level to six.

119.     On February 12, 2018, Defendants, in California, caused MabVax, from California, to file with the SEC a Current Report on Form 8-K, which attached a press release with a headline that trumpeted "MabVax Therapeutics Announces Positive Interim Data from Expanded Cohort in Phase 1 Trial Evaluating MVT-5873 in Combination with First-Line

Chemotherapy in Pancreatic Cancer." The press release described six patients who had been administered the Combination Trial at the lower dose level of 0.125 mg/kg, and claimed that the treatment "was generally well tolerated by all subjects," and that the "promising early results merit additional enrollment."

120.    These statements were materially false and misleading, because three of those six patients developed Grade 3 or Grade 4 pneumonitis, the specific condition that caused MabVax to shut down the trial entirely when the condition surfaced in additional patients.

121.    MabVax's former Vice President of Pharmaceutical Development, Paul Maffuid, has testified under oath that the third incidence of pneumonitis was sufficiently "serious" in nature, that MabVax had to notify the Food and Drug Administration, and revise its enrollment bulletin for patients. A "Serious" Adverse Event under the FDA guidelines, is not measured under the five-grade CTCAE criteria (first referenced in paragraph 8, *supra*), Rather, a "Serious" Adverse Event under the FDA guidelines is even more significant than a Grade 3 (Severe) Adverse Event under the CTCAE criteria. Specifically, Serious Adverse Events as defined by the FDA guidelines include those that result in death, require either inpatient hospitalization or the prolongation of hospitalization, are life-threatening, result in a persistent or significant disability/incapacity or result in a congenital anomaly/birth defect.

122.    All of those facts were omitted from the February 12, 2018 Form 8-K filing and press release, which instead stated that the data generated to date was "Positive" and that the Combination Trial treatment was "generally well tolerated by all subjects." In truth, on information and belief, three of the first six patients treated at the lowered, 0.125 mg/kg dose, suffered Grade 3 or worse pneumonitis.

123.   91. On or about April 2, 2018, MabVax and Defendants issued, in California, caused MabVax, from California, to file with the SEC a Current Report on Form 8-K that attached a press release reporting operational and financial results. This press release quoted Defendant Hansen as stating "We have made notable progress with our MVT-5873 [HuMab-5B1] and MVT-1075 clinical programs and are very encouraged with the positive data we have seen to date. We look forward to continuing enrollment in each program and participating in key scientific conferences over the course of 2018[.]" MabVax and Defendants omitted from this press release the material information, which they well knew, that due to an "adverse event," enrollment in these clinical trials had been suspended.

124.   The April 2, 2018 press release was materially false and misleading because it omitted to disclose that the majority of patients in the Phase 1b Combination Trial had suffered Severe or Life Threatening Adverse Events. This included three patients who had developed Grade 3 or Grade 4 pneumonitis, the specific condition that eventually caused MabVax to shut down the trial.

125.   92. On or about May 3, 2018, MabVax and Defendants issued, in California, caused MabVax, from California, to file with the SEC a Current Report on Form 8-K that attached a press release announcing a private placement securities offering. This press release quoted Defendant Hansen as stating:

> MabVax intends to use the net proceeds of the offering to fund continuing clinical developments of hitsits HuMab 5B1 antibody designated MVT-5873 in combination with gemcitabine and nab-paclitaxalnab-paclitaxel in first line therapy for the treatment of patients newly diagnosed with pancreatic cancer. The Company has treated two cohorts of patients for a total of six patients to date in this study; and these funds will enable the Company to continue enrolling up to approximately 10 additional patients with the objective of confirming early observations.

126.   The May 3, 2018 press release was materially false and misleading because it omitted to disclose that the majority of patients in the Phase 1b Combination Trial had suffered Severe or Life Threatening Adverse Events. This included three patients who had developed Grade 3 or Grade 4 pneumonitis, the specific condition that eventually caused MabVax to shut down the trial.

93. MabVax and Defendants omitted from this press release the material information, which they well knew, that, upon information and belief, due to an "adverse event", enrollment in these clinical trials had been suspended.

94. At no point before October 15, 2018 did MabVax and Defendants acknowledge in an 8-K or otherwise that patient enrollment had been suspended and that an "adverse event" had occurred.

95. During this period, MabVax and Defendants were soliciting Plaintiffs, including Honig and Colman, for investments. Plaintiffs believed, as was represented to them, that their investments would be used to fund the Phase 1 trials. Instead, the investments were used to fund Defendants' compensation.

127.   96. Based upon these misrepresentations and omissionsIn reliance upon Defendants' false and misleading statements identified above, Plaintiffs made the following equityadditional investments in MabVax:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| GRQ Consultants, Inc. Roth 401k FBO Renee Honig | $1,150,000 | 2/1/2018 |
| Robert S. Colman Trust UDT 3/13/85 | $100,000.50 | 2/5/2018 |
| GRQ Consultants, Inc. Roth 401k FBO Barry Honig | $100,000 | 2/8/2018 |
| Robert S. Colman Trust UDT 3/13/85 | $40,000.0040,000 | 5/2/2018 |
| GRQ Consultants, Inc. Roth 401k FBO Renee Honig | $300,000 | 5/8/2018 |

128.    Plaintiffs are informed and believed that at some point in 2018, a fourth participant in the Phase 1b Combination Therapy portion of the Clinical Trial developed pneumonitis. At that point, MabVax's team, including Defendant Hansen, determined that the Clinical Trial needed to be shut down to protect patients. Any ongoing treatment of patients was halted, and enrollment of additional patients was indefinitely suspended.

129.    Hanson and Hansen were both personally informed by other MabVax employees and/or the clinical personnel conducting and overseeing the trials that patient enrollment in the trial was being suspended. But MabVax and Defendants did not timely disclose that MabVax had suspended enrollment in the Clinical Trial.

130.    In fact, MabVax's and Defendants' first public acknowledgment that anything was amiss with the Clinical Trial appeared in MabVax's Form 10-Q for the first quarter of 2018, which was signed by both Defendants and which was filed extremely late – not until ***October 15, 2018***. There, MabVax and Defendants acknowledged the following:

> On February 12, 2018, we reported on interim results of the current cohort of the Phase 1 study, in which MVT-5873 was given in combination with nab-paclitaxel and gemcitabine to patients newly diagnosed with CA19-9 positive pancreatic cancer. MVT-5873 at a dose of 0.125 mg/kg when added to first-line chemotherapy was generally well tolerated by all subjects. At that time, all six patients in the current cohort demonstrated measurable tumor reductions, with four patients meeting the criteria for partial response (PR) and two patients meeting the criteria for stable disease (SD). We believe these results further confirm results reported on a portion of the cohort in late 2017. Patient CA19-9 levels, which are a prognostic indicator of the disease state, were markedly reduced in all subjects with this combination therapy. ***Due to adverse events potentially related to the combination of nab-paclitaxel, gemcitabine and MVT-5873, not seen in the monotherapy clinical study, the Company has suspended patient enrollment at the current dose,*** We are evaluating plans to enroll additional patients at a lower dose to further explore safety and response in a larger population. (emphasis added)

131.    At no point before October 15, 2018 did MabVax and Defendants acknowledge in an 8-K or otherwise that patient enrollment had been suspended due to the prevalence of many Severe Adverse Events.

132.    97. Further, hadHad Plaintiffs known the truth about MabVax's and Defendants' material misrepresentations and omissions in MabVax's SEC filings, they would never have made those investments in MabVax.  MabVax is now in bankruptcy, and its stock is worthless.

133.    98. MabVax's and Defendants' material misrepresentations and omissions not only induced Plaintiffs' investments, but they also are directly and causally connected to Plaintiffs' losses. The fact that the Phase 1 trialClinical Trial was not going well, as represented by MabVax and Defendants, but had in fact been suspended due to an adverse event directlyhad been plagued by a majority of patients suffering Severe or Life Threatening Adverse Events, the prevalence of which directly led to the suspension of the Clinical Trial, directly and negatively affected MabVax's ability to continue soliciting the funds in needed to continue as a going concern. This ultimately was the cause of MabVax's bankruptcy and Plaintiffs' injury. MabVax's and Defendants' misstatements and omissions pertained to the very risk that was concealed by their misrepresentations and omissions—that MabVax would fail. In other words, MabVax's and Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

## <u>COUNT I</u>
**Violations of Sections 25400(d) and 25500 of the California Corporations Code**
**Against All Defendants**

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-981-133 above, and further allege:

134. ~~99.~~ This claim is asserted against the Defendants on behalf of Plaintiffs, who each purchased MabVax securities throughout 2017 and 2018.

135. ~~100.~~ Defendants willfully carried out a plan, scheme, and course of conduct that was intended to and did deceive Plaintiffs, investors in MabVax, as alleged in this Complaint.

136. ~~101.~~ Defendants made or materially participated in the act of making statements that, at the time and in the light of the circumstances under which they was made, were false and misleading with respect to a material fact, or omitted to state material facts necessary in order to make their statements, in the light of the circumstances under which they were made, not misleading, with the purpose of inducing Plaintiffs to purchase MabVax securities that Defendants were selling.

137. ~~102.~~ This claim is based on Defendants' materially misleading statements or omissions detailed above, including those regarding the following:

> ~~(a) that Oxford had rejected MabVax's request for an additional $5,000,000 based on insufficient Phase I data;~~

> (a) the prevalence of Severe Adverse Events suffered by patients in the Clinical Trial, which surfaced as early as mid-2016, and consistently arose through 2017 and into 2018;

> (b) that the antibody treatment was "safe" and "well tolerated" despite the fact that it caused a majority of patients to suffer Severe Adverse Events; and,

> (c) ~~(b)~~ that patient enrollment in the ~~Phase 1 HuMab-5B Antibody trials had been~~Clinical Trial was suspended due to ~~an "adverse event."~~the prevalence of Severe Adverse Events suffered by patients.

138. 103. All of these statements and omissions, and many other communications, were made by Defendants in California, at the headquarters of MabVax.

139. 104. Defendants knew, or had reasonable grounds to believe, that their misstatements and omissions were false and misleading.

140. 105. Defendants, with the willful intent to defraud, intended that that their misstatements and omissions had the unlawful purpose of inducing Plaintiffs into purchasing securities. The Defendants had actual knowledge that Plaintiffs would not invest if they were told the truth of any one of the above statements.

141. 106. The Defendants were top officers and controlling persons of MabVax, and had direct involvement in its day-to-day operations. The material omissions from MabVax's public written and verbal solicitations that were made to Plaintiffs in connection with the investments was the collective action of the Defendants. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action and made verbal representations to the Plaintiffs as well.

142. 107. The Defendants had actual knowledge (or were reckless in disregarding) the misrepresentations and omissions of material facts set forth in this Complaint. The Defendants' material misrepresentations and omissions were done knowingly and/or recklessly and for the purpose and effect of concealing information from the solicited investors in order to secure their investments. MabVax and Defendants were aware of (or had ready access to) the very facts regarding the Oxford Loan and the phase I clinical trial that they misrepresented and misleadingly omitted.

143. 108. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, and in reliance on that

information, the Plaintiffs invested in the above investments. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true information been disclosed. Plaintiffs would not have purchased MabVax shares, including at the prices they paid, or at all, had they been aware of Defendants' fraudulent course of conduct. Further, Defendants' misstatements and omissions directly caused Plaintiffs' losses because the material misrepresentations and omissions were pertinent to circumstances that ultimately caused MabVax to enter bankruptcy thereby damaging Plaintiffs.

144. 109. Defendants' misstatements and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

145. 110. As a direct and proximate result of the wrongful conduct of the Defendants, Plaintiffs suffered damages in connection with their investments, and their loss was directly and proximately caused by Defendants' wrongful conduct.

<u>COUNT II</u>
**Violations of Sections 25504 and 25504.1 of the California Corporations Code based on MabVax's violation of Sections 25401 and 25501**
**Against All Defendants**

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-110 1-145 above, and further allege:

146. 111. This claim is asserted against the Defendants on behalf of Plaintiffs, who each purchased MabVax securities throughout 2017 and 2018.

147. 112. This claim is based on MabVax's and Defendants' materially misleading statements or omissions detailed above, including those regarding the following:

(a) that Oxford had rejected MabVax's request for an additional $5,000,000 based on insufficient Phase I data;

(a)    the prevalence of Severe Adverse Events suffered by patients in the Clinical Trial, which surfaced as early as mid-2016, and consistently arose through 2017 and into 2018;

(b)    that the antibody treatment was "safe" and "well tolerated" despite the fact that it caused a majority of patients to suffer Severe Adverse Events; and,

(c)    (b) that patient enrollment in the Phase 1 HuMab-5B Antibody trials had beenClinical Trial was suspended due to an "adverse event."the prevalence of Severe Adverse Events suffered by patients.

148.    113. All of these statements and omissions, and many other communications, were made by MabVax and Defendants in California, at the headquarters of MabVax.

149.    114. By virtue of their high-level positions within MabVax, participation in and awareness of MabVax's operations, direct involvement in the day-to-day operations of MabVax, and communications with MabVax's investors, the Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of MabVax, including the content and dissemination of statements and omissions by MabVax.

150.    115. The statements and omissions by MabVax set forth above were primary violations by MabVax of Section 25401 of the California Corporations Code, creating liability under Section 25501, because MabVax, from and in California, sold and offered to sell securities to Plaintiffs by means of those material misrepresentations and omissions.

151.    116. The Defendants are liable under Section 25504 of the California Corporations Code because MabVax is liable under Section 25501 of the Code for its violations

of Section 25401 of the Code, and both Defendants controlled MabVax. Further, Hansen was a

principal executive officer and a director of MabVax. Both Defendants materially aided in the

acts and transactions of MabVax constituting the violations of Section 25401.

152. 117. The Defendants also are liable under Section 25504.1 of the California

Corporations Code because MabVax is liable under Section 25501 of the Code for its violations

of Section 25401 of the Code, and both Defendants materially assisted MabVax in those

violations, and had the intent to deceive or defraud.

153. 118. Each of the Defendants had access to the MabVax's public filings and had

the ability to prevent the issuance of the false statements and material omission or cause such

misleading statements and omissions to be corrected.

154. 119. Hansen and Hanson signed the various SEC filings at issue containing

material misrepresentations and omissions in California. MabVax issued the SEC filings at issue

containing material and misrepresentations and omissions from its headquarters in California.

155. 120. Both Defendants retained significant managerial power in MabVax.

Defendants regularly negotiated contracts with Plaintiffs on MabVax's behalf, explained

MabVax's corporate strategy to Plaintiffs, solicited investors on MabVax's behalf, hired and

fired employees, and discussed potential board members. In short, Defendants directly controlled

MabVax and materially aided and assisted MabVax in the conduct that gives rise to this cause of

action (and every cause of action in this Complaint).

156. 121. MabVax and Defendants made untrue statements of material facts and

omitted to state material facts that were necessary to make those statements, in the light of the

circumstances under which the statements were made, not misleading.  These false and

misleading statements and omissions were contained in MabVax's public written statements and

its verbal solicitations to Plaintiffs in connection with their investments. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action. Most of the statements at issue were expressly attributed to the Defendants. Defendants also made materially false or misleading verbal representations to the Plaintiffs.

157.   ~~122.~~ MabVax and Defendants knew (or were reckless in disregarding) that at the time they were inducing Plaintiffs to invest in MabVax that they were making material misrepresentations and omitting material facts regarding the ~~Oxford Loan and~~ the Phase 1 clinical ~~trials~~trial. MabVax and Defendants were aware of (or had ready access to) the very facts that they misrepresented and misleadingly omitted.

158.   ~~123.~~ MabVax and Defendants intended that Plaintiffs would rely on Defendants' material misrepresentations and omissions and invest in MabVax.

159.   ~~124.~~ In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above investments. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true information been disclosed. Plaintiffs' reliance upon these statements was reasonable. Further, Defendants' material misstatements and omissions directly caused Plaintiffs' loss.

160.   ~~125.~~ Defendants' misstatements and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

161. 126. As a direct and proximate result of MabVax's and the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases or acquisition of MabVax stock.

### COUNT III[68]
### Fraudulent Inducement

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-126 1-161 above, and further allege:

162. 127. This claim is asserted against the Defendants on behalf of Plaintiffs, who each purchased MabVax securities throughout 2017 and 2018.

163. 128. The Defendants made materially false representations to Plaintiffs. The Defendants were top officers and controlling persons of MabVax, and had direct involvement in its day-to-day operations. The material omissions from MabVax's public written and verbal solicitations that were made to Plaintiffs in connection with the investments was the collective action of the Defendants. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action and made materially false verbal representations to the Plaintiffs as well.

164. 129. Defendants knew that at the time they were inducing Plaintiffs to invest in MabVax that they were omitting material facts that Plaintiffs were entitled to know, that they would want to know, and that would impact Plaintiffs' decision to invest in MabVax.

165. 130. Defendants intended that Plaintiffs would rely on Defendants' material misrepresentations and omissions and invest in MabVax.

---

[68] This Fourth Fifth Amended Complaint includes Counts III through VI V, notwithstanding the Court's prior dismissal of those claims, for clarity and reference, including with respect to any potential appeal of those dismissals purposes of preservation.

166. ~~131.~~ In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above investments. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true information been disclosed. Plaintiffs' reliance upon these statements was reasonable.

167. ~~132.~~ As a direct and proximate result of the wrongful conduct of the Defendants, Plaintiffs suffered damages in connection with their investments.

168. ~~133.~~ Defendants' misstatements and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

<u>COUNT IV</u>
**Common Law Fraud**

Plaintiffs re-allege, and adopt by reference herein, Paragraphs ~~1-133~~1-168 above, and further allege:

169. ~~134.~~ This claim is asserted against the Defendants on behalf of Plaintiffs, who each purchased MabVax securities throughout 2017 and 2018.

170. ~~135.~~ The Defendants made materially false representations to Plaintiffs. The Defendants were top officers and controlling persons of MabVax, and had direct involvement in its day-to-day operations. The material omissions from MabVax's public written and verbal solicitations that were made to Plaintiffs in connection with the investments was the collective action of the Defendants. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action and made materially false verbal representations to the Plaintiffs as well.

171. ~~136.~~ Defendants knew that at the time they were inducing Plaintiffs to invest in MabVax that they were omitting material facts that Plaintiffs were entitled to know, that they would want to know, and that would impact Plaintiffs' decision to invest in MabVax.

172. ~~137.~~ Defendants intended that Plaintiffs would rely on Defendants' material misrepresentations and omissions and invest in MabVax.

173. ~~138.~~ In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above investments. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true information been disclosed. Plaintiffs' reliance upon these statements was reasonable.

174. ~~139.~~ As a direct and proximate result of the wrongful conduct of the Defendants, Plaintiffs suffered damages in connection with their investments.

175. ~~140.~~ Defendants' misstatements and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

176. ~~141.~~ Defendants material misstatements and omissions directly and proximately caused Plaintiffs' economic loss. The very pieces of information that Defendants made misleading statements about or omitted from Plaintiffs were the factors that caused the demise of MabVax and the Plaintiffs to suffer losses.

## <u>COUNT V</u>
## **Common Law Negligent Misrepresentation**

Plaintiffs re-allege, and adopt by reference herein, Paragraphs ~~1-141~~1-175 above, and further allege:

177. 142. The relationship between Plaintiffs and Defendants constituted a relationship in which Plaintiffs reposed in Defendants deep trust, dependence, confidence, counsel, and reliance such that a fiduciary relationship was established.

178. 143. Defendants knew that Plaintiffs would and did rely and depend on Defendants representations and judgments with regard to the funds Plaintiffs invested in MabVax and, in so doing, Defendants undertook Plaintiffs' trust and confidence and Defendants, by their words and action, undertook and assumed a duty to advise, counsel and protect Plaintiffs.

179. 144. Plaintiffs at all times relied upon Defendants' representations, financial judgment and decision-making with regard to MabVax and Plaintiffs' decision to invest in MabVax.

180. 145. Defendants were all aware of Plaintiffs' reliance, dependence upon, and trust of them as principals of MabVax.

181. 146. The Defendants made materially false representations to Plaintiffs. The Defendants were top officers and controlling persons of MabVax, and had direct involvement in its day-to-day operations. The material omissions from MabVax's public written and verbal solicitations that were made to Plaintiffs in connection with the investments was the collective action of the Defendants. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action and made material verbal misrepresentations to the Plaintiffs as well.

182. 147. In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above investments. Plaintiffs would not have made their investments and suffered

the economic loss associated with making their investment into MabVax had the true information been disclosed. Plaintiffs' reliance upon these statements was reasonable.

183. ~~148.~~ As a direct and proximate result of the wrongful conduct of the Defendants, Plaintiffs suffered damages in connection with their investments.

184. ~~149.~~ Defendants material misstatements and omissions directly and proximately caused Plaintiffs' economic loss. The very pieces of information that Defendants made misleading statements about or omitted from Plaintiffs were the factors that caused the demise of MabVax and the Plaintiffs to suffer losses.

185. ~~150.~~ Defendants' misstatements and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. In other words, Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

~~**COUNT VI**~~
~~**Tortious Interference with Contract**~~

~~Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-150 above, and further allege:~~

~~151. The August 8, 2017 Letter Agreement between MabVax and certain Plaintiffs was a valid contract.~~

~~152. The August 8, 2017 Letter Agreement was willfully and intentionally interfered with by the Defendants. The Defendants, in their capacities as officers of MabVax, forced MabVax to breach that agreement.~~

~~153. Even though the August 8, 2017 Letter Agreement obligated MabVax to reduce the employment terms of management and to defer portions of their salaries, the Defendants, while in control of MabVax, did not allow MabVax to do either.~~

154. The Defendants did not allow MabVax to reduce their salaries or employment terms because that was in their interest and part of their scheme to extract exorbitant compensation from MabVax.

155. Due to the Defendants' intentional interference, Plaintiffs did not receive the benefit of their bargain and were thereby damaged.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief and judgment:

(a) An award of monetary damages against Defendants, jointly and severally, in an amount according to proof at trial, together with interest thereon;

(b) Costs of suit, including but not limited to Plaintiffs' attorneys' fees and expert fees; and

(c) Such other and further relief as the Court deems just and proper.

Dated:  New York, New York
            ~~November 30~~May 25, ~~2021~~2022

                     SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

               By: */s/ Robert D. Weber*

                     Christopher J. Bosch
                     Jeff Kern
                     30 Rockefeller Plaza
                     New York, New York 10112
                     Telephone: (212) 653-8700
                     Facsimile: (212) 653-8701
                     cbosch@sheppardmullin.com
                     jkern@sheppardmullin.com

                        – and –

                     Robert D. Weber (admitted *pro hac vice*)
                     1901 Avenue of the Stars, Suite 1600
                     Los Angeles, California 90067-6017
                     Telephone: (310) 228-3700
                     Facsimile: (310) 228-3701
                     rweber@sheppardmullin.com

                        – and –

                     Daniel R. Walfish
                     WALFISH & FISSELL PLLC
                     405 Lexington Avenue 8th Floor
                     New York, New York 10174
                     Telephone: (212) 672-0521
                     dwalfish@walfishfissell.com

| Summary report: Litera Compare for Word 11.1.0.69 Document comparison done on 5/25/2022 3:24:19 PM | |
|---|---|
| **Style name:** SMRH2 | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Honig v Hansen and Hanson - Fourth Amended Complaint.docx | |
| **Modified filename:** Honig v Hansen and Hanson - Fifth Amended Complaint.docx | |
| **Changes:** | |
| Add | 442 |
| Delete | 374 |
| Move From | 43 |
| Move To | 43 |
| Table Insert | 3 |
| Table Delete | 2 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 2 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 909 |